# United States Court of Appeals
## For the First Circuit

---

Nos. 19-1305
     19-1312
     19-1315
     20-1603
     20-1604
     20-1920
     20-1951
     21-1098
     21-1100

UNITED STATES OF AMERICA,

Appellee,

v.

AUREA VÁZQUEZ RIJOS, a/k/a Beatriz Vázquez, a/k/a Aurea
 Dominicci; MARCIA VÁZQUEZ RIJOS; and JOSÉ FERRER SOSA,

Defendants, Appellants.

---

APPEALS FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

[Hon. Daniel R. Domínguez, U.S. District Judge]

---

Before

Barron, Chief Judge,
Lipez and Thompson, Circuit Judges.

---

Lydia Lizarribar Masini for appellant Aurea Vázquez Rijos.

Carlos M. Sánchez La Costa for appellant Marcia Aurea Vázquez Rijos.

José R. Olmo Rodríguez for appellant José Ferrer Sosa.

Sofia M. Vickery, Attorney, Appellate Section, Criminal Division, United States Department of Justice, with whom W. Stephen Muldrow, United States Attorney, Mariana E. Bauzá Almonte, Assistant United States Attorney, Chief, Appellate Division, José A. Ruiz Santiago, Assistant United States Attorney, Jenifer Yois Hernández, Assistant United States Attorney, Kenneth A. Polite, Jr., Assistant Attorney General, and Lisa H. Miller, Deputy Assistant Attorney General, were on brief, for appellee.

———————————

July 31, 2024

———————————

**THOMPSON**, <u>Circuit Judge</u>.   Old San Juan, September 22, 2005, around midnight.   Husband and wife Adam Anhang Uster (a Canadian entrepreneur) and Aurea Vázquez Rijos (a former "Miss Puerto Rico Petite") were walking down the cobbled streets of Puerto Rico's capital city after leaving a trendy bistro.   A man emerged from the shadows.   "This is a robbery," he said in English. Adam punched him in the face and shoved Aurea away, screaming "Run, Baby, run."   She did not, however.   And the mugger stabbed and beat Adam to death.   Turning to Aurea, the man then hit her in the head.   But sensing others' eyes now on him, he took off.[1]

In the years after that, a Puerto Rico jury would convict an innocent person of the murder.   He would later win release, thankfully.   Meanwhile private investigators hired by Adam's family would traipse all over (including Europe) looking for helpful evidence.   And after plenty of twists and turns, police would arrest Aurea, Aurea's sister Marcia Vázquez Rijos, and Marcia's boyfriend José Ferrer Sosa on federal murder-for-hire charges — one of the twists and turns involved a complex extradition process to retrieve Aurea from Spain, a country she had fled to.[2]

---

[1] Our opinion will be an easier read if we sometimes use first names.   We mean no disrespect.

[2] By agreement with Spain the government promised to try Aurea under the original indictment.   Count one of that indictment

- 3 -

The government's trial case included lots of incriminating particulars. Like how six months before the murder Adam and Aurea signed a prenup that would pay her about $8 million if he died but only $3,500 a month for 36 months (unless she remarried) if they divorced within a year. Like how Aurea also came to believe that she was "better off" under the prenup with Adam "dead than alive" and asked someone if he knew a hitman who could kill Adam. Like how 12 hours before the murder Adam told Aurea that he wanted a divorce, to which she replied, "I am not going to let you go that easy." And like how Aurea's description of the attacker differed from others' and how she acted uncooperatively with police.

The government's biggest witness was probably Alex Pabón Colon. Nicknamed "El Loco" (Spanish for "The Crazy One"), Pabón (as we will call him, per Spanish naming customs we follow for the rest of the opinion) testified that Aurea, Marcia, and José had hired him to kill Adam and hurt Aurea — while making it all look like a robbery gone wrong. The defense pushed back with questions

charged her with conspiring to commit murder for hire resulting in Adam's death. Count two charged her with use of an interstate facility to commit murder for hire. The government tried Marcia and José under a second superseding indictment. Count one of that indictment accused them of conspiring to commit murder resulting in Adam's death.

designed to highlight Pabón's history of mental instability (among other efforts).

A federal jury eventually convicted Aurea of murder for hire, and her, Marcia, and José of conspiring to commit murder for hire. Each got life behind bars.

The trio now appeal, raising a dizzying array of issues spanning the trial, sentencing, and post-trial phases. We address the claims one by one below, filling in details needed to put things into workable perspective. At the end of it all, however, we **affirm** across the board.

I
**Sufficiency of the Evidence**

Marcia and José say that the government did not present enough evidence to support their conspiracy-to-commit-murder-for-hire convictions.[3]

We assess their preserved challenges *de novo*, taking all the evidence — including credibility choices and reasonable inferences — in the light most favorable to the prosecution and asking whether a sensible jury could find the crime's essential elements proven beyond a reasonable doubt. See, e.g., United

---

[3] We start like this because a winning sufficiency argument would compel us to vacate the challenged conviction and block any retrial for the same offense under the Fifth Amendment's Double Jeopardy Clause. See United States v. Raymundí-Hernández, 984 F.3d 127, 138 (1st Cir. 2020).

States v. Maldonado-Peña, 4 F.4th 1, 50 (1st Cir. 2021). And to simplify slightly (but without affecting our analysis), the statute of conviction punishes anyone "[w]ho[] travels in or causes another . . . to use . . . any facility of interstate . . . commerce . . . with the intent that a murder be committed" for hire, "or who conspires to do so." See 18 U.S.C. § 1958(a).[4] "As used in this section . . . 'facility of interstate . . . commerce' includes means of transportation and communication." See id. § 1958(b)(2).

## A
### Marcia's Arguments

Marcia first argues that the conspiracy had to have ended with Adam's death and so the evidence against her did not suffice

---

[4] The statute reads in full:

> Whoever travels in or causes another (including the intended victim) to travel in interstate or foreign commerce, or uses or causes another (including the intended victim) to use the mail or any facility of interstate or foreign commerce, with intent that a murder be committed in violation of the laws of any State or the United States as consideration for the receipt of, or as consideration for a promise or agreement to pay, anything of pecuniary value, or who conspires to do so, shall be fined under this title or imprisoned for not more than ten years, or both; and if personal injury results, shall be fined under this title or imprisoned for not more than twenty years, or both; and if death results, shall be punished by death or life imprisonment, or shall be fined not more than $250,000, or both.

because the government focused on "acts and statements" *after* his passing. Consistent with the adage that "'the simplest'" way to decide an issue "is often 'best,'" see <u>Calvary Chapel of Bangor</u> v. <u>Mills</u>, 52 F.4th 40, 48 n.5 (1st Cir. 2022) (quoting <u>United States</u> v. <u>Cruz-Ramos</u>, 987 F.3d 27, 39 (1st Cir. 2021)), we bypass the dispute about the conspiracy's precise end date because ample evidence showed her active participation from the beginning.

Asked directly by a prosecutor about "[w]ho hired you to commit the murder?" Pabón answered categorically, "Marcia . . . , Aurea . . . , and José." And he identified all three in open court too.

Pabón's testimony painted a grim picture. A dope dealer, Pabón met with "clients" at The Pink Skirt — a nightclub Adam had bought Aurea. José worked there as a cook. And he was one of Pabón's drug clients as well. So were Aurea and Marcia. The day before Adam died, Pabón spent time with Aurea, Marcia, and José at The Pink Skirt and then at an eatery called El Hamburger (they drove there in Aurea's Porsche SUV). They agreed that Pabón would find a gun, kill Adam after Adam had dinner with Aurea, make the murder look like a robbery by taking Adam's wallet and hurting Aurea, and later get $3 million from Aurea (part of the money she expected to get from Adam's estate).

- 7 -

All of this undercuts Marcia's claim that the evidence showed only her "mere presence" at a conspiratorial event. She is right that mere presence cannot establish knowing participation in a conspiracy. See, e.g., United States v. Munyenyezi, 781 F.3d 532, 538 (1st Cir. 2015). But Pabón's fingering her as one of the three persons who hired him to kill Adam shows she was culpably present, not merely present. See United States v. Echeverri, 982 F.2d 675, 678 (1st Cir. 1993) (explaining that "a defendant's 'mere presence' argument will fail in situations where the 'mere' is lacking"). If more were needed — and we do not think that it is — the jury could "rely on [the] common[-]sense . . . infer[ence] that criminal conspirators do not involve innocent persons at critical stages of a" crime's planning. See United States v. Llinas, 373 F.3d 26, 32 (1st Cir. 2004) (citation omitted).

Marcia responds by attacking Pabón's credibility, arguing that his grand-jury testimony indicated that the conversation at The Pink Skirt centered on just "beating" Adam and that she did not go to El Hamburger. But her attorney explored the inconsistency theme with Pabón during cross-examination — unsuccessfully it turns out, because the jury convicted her anyway. And we cannot reweigh witness credibility on a sufficiency challenge. See, e.g., United States v. Acosta-Colón, 741 F.3d 179, 191 (1st Cir. 2013).

Perhaps anticipating this critique, Marcia calls Pabón's testimony uncorroborated as to her role. But our caselaw says that "the uncorroborated testimony of a single cooperating witness may be sufficient to support a conviction, so long as the testimony is not facially incredible." See United States v. Velazquez-Fontanez, 6 F.4th 205, 215 (1st Cir. 2021). And Marcia makes no convincing argument that Pabón's testimony falls into that facially-incredible category for sufficiency purposes, thus waiving whatever argument she may have had. See Rodríguez v. Mun. of San Juan, 659 F.3d 168, 175 (1st Cir. 2011).[5]

**B**
**José's Arguments**

Pabón named José as one of his hirers in this murder-for-hire crime. He gave José props for getting his payment bumped from $2 million to $3 million. And he explained how José called him on the night of the murder, met up with him in Old San Juan, pointed out the restaurant where Adam and Aurea were, and told him to wait for them to come out. Questioning Pabón's memory and calling his answers "unreliable" and "unresponsive" (along with other pejoratives), José suggests that the jury should not have

---

[5] Marcia's very brief suggestion that no evidence showed she "knew . . . any cars or phones would be used with the required intent to murder" is too underdeveloped for us to consider. See, e.g., United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990).

- 9 -

believed that incriminating account.  What he is doing though is picking a credibility fight — for example, José writes that Pabón "testified" at trial that he (Pabón) did not have an affair with Aurea (a person he was starstruck over), yet he admitted telling his friends and also the grand jury that he had had sex with her. José's lawyer, however, delved into these areas during cross-examination — to no avail, because the jury still found José guilty.  And such a routine credibility call is for the jurors, with us required to assume on sufficiency review that they called it in the government's favor.  See, e.g., Acosta-Colón, 741 F.3d at 191.

Unlike Marcia, José labels Pabón's testimony "facially incredible."  But he offers no persuasive explanation for why this is so.  And "developing a sustained argument out of . . . legal precedents is a litigant's job, not ours."  Díaz-Alarcón v. Flández-Marcel, 944 F.3d 303, 313 (1st Cir. 2019) (quotation marks omitted).

Relying mostly on his own trial testimony, José next claims that "[s]ubstantial evidence" created reasonable doubt about his guilt.  But because he took the stand, the jury could disbelieve his testimony that he did not hire Pabón to murder Adam. See United States v. Iossifov, 45 F.4th 899, 916 (6th Cir. 2022); United States v. Williams, 390 F.3d 1319, 1325-26 (11th Cir. 2004).

Also and critically, we need not rule "that no verdict other than . . . guilty . . . could sensibly be reached, but must only be satisfied that the verdict finds support in a plausible rendition of the record." See United States v. Liriano, 761 F.3d 131, 135 (1st Cir. 2014) (quotation marks omitted) — a standard met here.

José also offers two sufficiency arguments that target the interstate-commerce element for his conviction. First he claims that the government had to — but did not — show that a defendant used an interstate-commerce facility (*e.g.*, an auto or a phone) *across* borders. While he preserved that argument by raising it in the district court, it fails here as it did there. The murder-for-hire statute once barred the use of a "facility *in* interstate . . . commerce." See United States v. Fisher, 494 F.3d 5, 9 (1st Cir. 2007) (quoting statute). But a 2004 amendment changed "facility *in* interstate commerce" to "facility *of* interstate . . . commerce." See id. at 10 (quoting statute and amendment). And devastating to José's position, that change codified the prevailing view that "a showing of *intrastate usage* of a requisite facility, such as a telephone, suffices." See id. (emphasis added). Second — citing no authority — José also argues that vehicles on the island of Puerto Rico are *per se* not facilities of interstate or foreign commerce because Puerto Rico is an island unto itself. As the government rightly points out,

however, he did not press this claim below — thus making it reviewable (if at all) only for plain error. See United States v. Rivera-Rivera, 555 F.3d 277, 285 (1st Cir. 2009). But because he neither supports this claim nor tries to show plain error, he waived it. See United States v. Rivera-Carrasquillo, 933 F.3d 33, 49 n.15 (1st Cir. 2019).

## II
## Severance

Raising a preserved claim, Marcia and José next contend that the judge should have severed their trials from Aurea's.

Defendants may be tried together "if they are alleged to have participated in the same act or transaction." Fed. R. Crim. P. 8(b). Such trials serve important interests, like easing the burdens on victims, witnesses, and jurors, shrinking the risk of inconsistent verdicts, and conserving scarce judge time. See Zafiro v. United States, 506 U.S. 534, 537 (1993); United States v. Josleyn, 99 F.3d 1182, 1188 (1st Cir. 1996). So "[t]here is a preference in the federal system for joint trials of defendants who are indicted together," Zafiro, 506 U.S. at 537 — a preference that is especially strong in conspiracy cases, United States v. Floyd, 740 F.3d 22, 36 (1st Cir. 2014).

A preference of course is not an unwavering command. See Fed. R. Crim. P. 14(a) (declaring that "[i]f the joinder of . . . defendants in an indictment . . . appears to prejudice a

- 12 -

defendant . . . , the court may . . . sever the defendants' trial[], or provide other relief that justice requires"). But the exceptions to it are few and far between. See United States v. Houlihan, 92 F.3d 1271, 1295-96 (1st Cir. 1996). Severance-seeking "defendant[s] must demonstrate *extreme* prejudice, such as by showing a 'serious risk that a joint trial would compromise a specific trial right,' or would 'prevent the jury from making a reliable judgment about guilt or innocence.'" Id. at 1295 (emphasis added and quoting Zafiro, 506 U.S. at 539). And even if the risk of prejudice is high, they must show that severance is the proper cure — usually meaning that jury instructions or some other remedy short of severance will *not* work. See Zafiro, 506 U.S. at 539. Making matters more difficult for Marcia and José, we review their challenge to the judge's severance refusal only for a "manifest abuse of discretion" — knowing that even in "gray area[s]" where "reasonable people might disagree about the advisability of severance," a severance fight normally will be "won or lost in the district court." See Houlihan, 92 F.3d at 1296 (quotation marks omitted).

Measured against these benchmarks, Marcia and José cannot prevail. Separate trials in a case like this — where the focus is on the interconnected relationships among defendants — would be repetitive, forcing witnesses to provide the same

- 13 -

testimony again and again, and placing incredible demands on every participant in the judicial system (as described above). Hoping to counter this point, Marcia and José argue that the joint trial caused spillover or guilt-by-association prejudice based on certain testimony — including about Aurea's hitman search, civil suit against Adam's parents, and fleeing to avoid capture. We doubt that this is the kind of extreme prejudice required to win reversal. See, e.g., United States v. DeCologero, 530 F.3d 36, 54 (1st Cir. 2008) (holding in a severance-denial case that evidence of one defendant's murder of a witness was relevant because it "tended to prove the existence and nature of the . . . conspiracy"). Certainly anything that ups the chance of conviction "prejudices" defendants in the word's *usual* sense. But severance law does *not* use "prejudice" like that. Which is why — despite what Marcia and José imply — it does not matter that the government's case against Aurea may have been stronger than against them, or that they may have gotten off at trials separate from Aurea's. See Zafiro, 506 U.S. at 540; see also United States v. O'Bryant, 998 F.2d 21, 26 (1st Cir. 1993). Regardless, whatever prejudice existed got scotched by the judge's explicit instructions that the jury consider the case against each defendant

separately and individually.[6]  See, e.g., Houlihan, 92 F.3d at

1296.  We presume that juries follow such directives.  See, e.g.,

United States v. Chisholm, 940 F.3d 119, 129 (1st Cir. 2019).  And

neither Marcia nor José has persuasively rebutted that

presumption.  So we cannot say the judge manifestly abused his

discretion.

## III
### Evidentiary Matters

Aurea, Marcia, and José make a series of evidentiary

arguments.

---

[6] The instruction read:

> Counts are charged against each of the
> defendants in each count of their
> corresponding indictment. Each count, and the
> evidence pertaining to it, should be
> considered separately as to each defendant.
> The fact that you may find guilty or not guilty
> on one count should not control your verdict
> on another count as to each defendant.  You
> must provide separate consideration to the
> evidence as to each count and as to each
> defendant.  Aurea Vazquez-Rijos is charged as
> to two counts in the original Indictment.  Co-
> defendants Marcia Vazquez-Rijos and Jose
> Ferrer-Sosa are charged as to one count in the
> Second Superseding Indictment.  You must
> provide separate consideration as to each
> defendant in the indictment filed against
> him/her.

The judge also gave separate limiting instructions for certain
categories of evidence.  Consider, as a for-instance, his telling
the jurors that neither Marcia nor José was "involved" with the
hitman "testimony."

## A
## Flight Evidence

Aurea claims that the judge erred by admitting "flight evidence" to show her "consciousness of guilt."

That evidence — by way of background — included some of the following.  In June 2006 — not long after Adam's murder and a few months after police arrested a man named Jonathan Roman Rivera for the crime — Aurea moved to Italy.  She had very little money.  She started going by the name "Aurea Dominicci."  And she tried to make a living as a tour guide.  Over the next year she sued Adam's parents for a piece of his estate, travelled to Puerto Rico for a deposition in that case, and returned to Italy.  Roman got convicted around then too.  And Aurea declined to come back for another deposition in her suit.  In spring 2008 a federal probe into Adam's murder led to Roman's release, Pabón's arrest, and Pabón's and Aurea's indictment on murder-for-hire-related charges (Marcia and José would be indicted years later).  Pabón pled guilty. Aurea promised to voluntarily return to the United States.  She never would.  Instead she began faking documents to prove she was Jewish in the hopes of finding refuge in Israel (she had asked a legal expert whether "the law in Israel" would "protect" her "[i]f there was ever an order of extradition with a death

sentence"). But authorities arrested her in Spain in June 2013. And two years later she got extradited back to Puerto Rico.[7]

Aurea offers innocent explanations for her moves, saying for example that she went overseas to start a new life and to protect herself from Adam's father (whom she alleges had sicced private investigators on her as part of his plan to avenge his son's death). From there she argues that the government did not (and here we quote a case she quotes) "present sufficient extrinsic evidence of guilt to support an inference that [her] flight was not merely an episode of normal travel but, rather, the product of a guilty conscience related to the crime alleged." See United States v. Benedetti, 433 F.3d 111, 116 (1st Cir. 2005) (stressing that "[b]ecause flight may be consistent with innocence as easily as with guilt, this precursor helps ensure that a jury does not infer guilt based solely on a defendant's meanderings"). And she

---

[7] The judge (capitalization altered) told the jurors that

> intentional flight by Aurea . . . may be considered by you in light of all the other evidence in the case. The burden is upon the government to prove intentional flight. Intentional flight after Aurea . . . was accused of a crime is not alone sufficient to conclude that she is guilty.

The judge added that "[f]light does not create a presumption of guilt," that "feelings of guilt, which are present in many innocent people, do not necessarily reflect actual guilt," and that "you should consider there may be reasons for Aurea['s] . . . actions that are fully consistent with innocence."

- 17 -

implies that the judge should have kept the flight evidence out under Fed. R. Evid. 403 — a rule that says that a court may exclude "relevant" evidence "if its probative value is substantially outweighed by a danger of unfair prejudice."

We need not decide whether Aurea has shown error because even if she has (which we in *no way* intimate) any error was harmless. Just consider some of the other evidence against her besides the flight evidence. Pabón credibly testified that Aurea had hired him to kill Adam. Another person testified that she had said she was "better off" under the prenup "with [Adam] dead than alive" and had asked if he knew a hitman who could "do the job" for her. And an officer testified that her description of the attacker clashed with those given by other witnesses (suggesting she made things up to cover her crime) and that she did not fully cooperate with police (indicating a desire to keep the constabularies at bay). So by our lights, the judge's decision to admit the flight evidence did not substantially affect the jury's verdict — which makes his decision (at worst) harmless error. See, e.g., United States v. Galíndez, 999 F.3d 60, 64 (1st Cir. 2021) (discussing the standard).

- 18 -

## B
## Email Evidence

Marcia and José — sometimes separately, sometimes together — challenge the judge's admission of several emails.[8]

## 1
## June 2007 Email

An email from Marcia to Aurea — sent in June 2007 — said she (Marcia) needed more money for José and did not "want to have him as an enemy because he knows a lot about me."  "Mommy doesn't want me to even see him," Marcia added (emphasis ours), "because *supposedly he is a violent crazy person*."

José calls the italicized phrase excludable hearsay because (his argument goes) "it was not Marcia['s] . . . statement but her mother's[,] . . . and her mother . . . did not testify at trial."  But his lawyer conceded during a trial sidebar that *Marcia* made the violent-and-crazy point, *not* her mother.  So José waived the argument that someone other than Marcia made the statement. See United States v. Walker, 538 F.3d 21, 23 (1st Cir. 2008).  He next says that if Marcia made the statement, it came (in his view at least) "after the conspiracy" and thus constituted "inadmissible hearsay" (as a reminder, the defendants theorize

---

[8] To the extent the emails have grammatical and syntactical errors, we still quote them as-is because using "[*sic*]" would be too distracting and might change their meaning.

that the conspiracy ended with Adam's death).  But his trial attorney objected to the statement as forbidden "character" evidence.  And he gives us no persuasive reason not to follow our usual rule that "legal theories not raised squarely in the lower court cannot be broached for the first time on appeal."  See Teamsters, Chauffeurs, Warehousemen & Helpers Union, Loc. No. 59 v. Superline Transp. Co., 953 F.2d 17, 21 (1st Cir. 1992).

**2**
**July 2007 Email**

Another email from Marcia to Aurea — sent in July 2007 — said she (Marcia) was "getting frustrated" but hoped "[t]hat old man will pay sooner or later"; worried José, who "was present during the good and the bad," would "think that I abandoned him and think that we used him"; and warned her (Aurea) to "[b]e careful with your back" because "[t]here are a lot of enemies close who you owe for a long time, and they are aware of your every move."  Aurea responded by email saying she empathized with how she (Marcia) and José felt, promised to call José, and noted "we are all in the same boat."

Raising a preserved challenge — thus activating abuse-of-discretion review, see United States v. Polanco, 634 F.3d 39, 44 (1st Cir. 2011) — Marcia and José argue that the judge wrongly admitted the emails under Evidence Rule 403, which (again) excludes evidence if its "unfair" prejudicial effects "substantially

- 20 -

outweigh[]" its probative value. Still claiming that the conspiracy ended with Adam's murder in 2005, they call these post-murder emails irrelevant. They then say that "[t]he unfair prejudicial damage of these communications after the conspiracy ended is that it allows the government through post-murder conduct that has nothing to do with [the-murder-for-hire-related] elements . . . to convict [them] on speculation."

Even assuming without granting that Marcia and José are right about the conspiracy's end point (the government counters that the conspiracy actually ended years later when Aurea's suit against Adam's parents ended in defeat in 2011), this does not help them.

A defendant's conduct after the crime's commission can be relevant. Otherwise, for example, a defendant's bid to cover up a crime's occurrence could never be admitted to show consciousness of guilt — which we know is *not* true. See, e.g., United States v. Sasso, 695 F.3d 25, 29 (1st Cir. 2012). The relevance threshold is a small one, "requiring only that the evidence have '*any* tendency to make a fact more or less probable.'" Cruz-Ramos, 987 F.3d at 42 (quoting Fed. R. Evid. 401). And the disputed evidence cleared it. Marcia's email touched on efforts to get money from Adam's estate (discussing her "frustrat[ion] that old man will pay sooner or later"), José's conspiracy

involvement (mentioning she "wouldn't want him to think I abandoned him and think that we used him"), and the need to pay Pabón (telling Aurea to "be careful with your back," adding "[t]here are a lot of enemies close who you owe for a long time"). Aurea replied that she would call José and that "we are all in the same boat." From that evidence a jury could infer Marcia's and José's conspiracy involvement. See Bielunas v. F/V Misty Dawn, Inc., 621 F.3d 72, 76 (1st Cir. 2010) (noting that "[a] relevancy-based argument is usually a tough sell," and adding that "the evidence need not definitively resolve a key issue in the case" but "need only move the inquire forward to some degree").

Marcia and José also give us no convincing reason for believing that any of this evidence, even if prejudicial, was *unfairly* prejudicial let alone *so unfairly prejudicial* as to *substantially* outbalance its probative worth. See In re PHC, Inc. S'holder Litig., 894 F.3d 419, 440 (1st Cir. 2018) (emphasizing that "battles over how to strike the balance between probative value and unfairly prejudicial effect are usually won or lost in the district court").

It is a pretty "[r]are[]" day when we will "override a judge's balancing of relevance and prejudice." Polanco, 634 F.3d

at 44.  And we see no credible basis for "second-guess[ing] the judge's discretionary judgment here."[9]  See id.

### 3
### March 2012 Email

Yet another email from Marcia to Aurea — sent in March 2012 — noted that their brother said that she (Marcia) and José had "PLANNED EVERYTHING" and that she had told him:

> YOU MENTALLY RETARDED ANIMAL DEVIL LUCIFER DON'T YOU KNOW THAT THEY ARE RECORDING EVERYTHING AND EVERYTHING YOU SAY THEY WILL BELIEVE IT AND WE ARE GONNA GET SCREWED BY YOUR FAULT LUCIFER.

Pushing another preserved error claim — again generating abuse-of-discretion review, see id. — Marcia says that comment by her brother was inadmissible hearsay and so had "dubious probative value and an exponential high risk of prejudice."  José tries to challenge the email's admission too.  But the judge admitted the email against Marcia only.  And José develops no spillover-prejudice argument keyed to this situation, resulting in waiver. See Zannino, 895 F.2d at 17.

The judge admitted the brother's statement that Marcia and José had "PLANNED EVERYTHING" to provide "context" for Marcia's

---

[9] José wishes to "adopt" Marcia's arguments about emails "between him and [her]," presumably referring to some 2010 emails where he asks Marcia and Aurea for money.  But Marcia does not challenge the 2010 emails.  So we need not consider this undeveloped claim.  See Zannino, 895 F.2d at 17.

- 23 -

reaction ("DON'T YOU KNOW THAT THEY ARE RECORDING EVERYTHING AND EVERYTHING YOU SAY THEY WILL BELIEVE IT AND WE ARE GONNA GET SCREWED BY YOUR FAULT LUCIFER") — a reaction that indicates a need for a cover up. Statements offered not for their truth but to provide the context of a reply are not hearsay. See United States v. Cruz-Díaz, 550 F.3d 169, 176-77 (1st Cir. 2008). And the judge told the jury to consider the statements of nonparties in the email not "for the truth of the matter, but only to provide context to statements made by a defendant." See id. (concluding that testimony was not hearsay based in part on fairly similar jury instructions).

As a last-gasp argument, Marcia accuses the judge of not conducting a "meaningful [Evidence Rule 403] analysis" for this email (or any of them, for that matter). But as reflected in the many pages of trial transcript, the judge actively engaged with counsel at side bar and carefully considered their objections. The judge did enough, seeing how our "great deference" applies "even when a judge does not expressly explain the Evidence Rule 403 balancing process on the record." See United States v. Breton, 740 F.3d 1, 14 (1st Cir. 2014).

## IV
## Judicial Bias

Marcia and José think that the judge displayed bias against them — a claim that (a) requires them to show that the

- 24 -

judge "gave the appearance of bias" *and* that the "apparent bias seriously prejudiced" them, and (b) requires us to review preserved challenges for abuse of discretion only.  See Raymundí-Hernández, 984 F.3d at 145 (quotation marks omitted).[10]  They make a number of arguments for reversing, all insinuating that the judge showed impermissible bias against them by acting like an advocate for the prosecution in front of the jury.  We find some arguments waived through inadequate briefing, however.  And while always "sensitive to a judge's unflagging duty to be impartial," see United States v. Caramadre, 807 F.3d 359, 373 (1st Cir. 2015), we find the other arguments are not difference-makers.

**A**
**Marcia's and José's Waived Arguments**

We lead with the waived arguments.

An investigating officer testified that at one point the same attorney represented Roman (the originally accused killer) *and* Aurea (before her indictment).  The judge asked him, "So how could he be an attorney when Aurea was a victim?  At that time, Aurea was a victim, right?"  "Correct," the officer answered.  Marcia contends that "[t]his intervention showed judicial bias in

---

[10] José calls these supposed errors "structural" for which prejudice is presumed.  But his claim "runs head first into our precedent which has consistently required proof of 'serious prejudice.'"  See United States v. Lanza-Vázquez, 799 F.3d 134, 145 (1st Cir. 2015).

- 25 -

favor of the prosecution."  Not only does she fail to explain how the judge's questions "favor[ed]" the prosecution, but she also fails to make a serious-prejudice showing — *i.e.*, she has not shown how, "but for" the allegedly improper intervention, "the verdict would have been different."  See United States v. Rivera-Rodríguez, 761 F.3d 105, 112 (1st Cir. 2014).  And that will not do.  See Zannino, 895 F.2d at 17.

Marcia suggests in passing that the judge should not have "presided over the criminal case" because he also "presided over Aurea's civil case."  But by making the suggestion without any developed rationale, she waived it.  See id.

José argues that the judge "unfairly undermined" his credibility by asking certain questions.  With José on the stand, the judge's first contested question clarified whether the "Alex El Loco" his lawyer had mentioned in a question was Pabón.  José replied that he "later knew him as" Pabón.  He now says that the judge's inquiry implied that he (José) "knew [Pabón] very well and not only as a drug dealer."  We do not see how.  But José's team did not object to this question, as the government notes — without any protest from José.  That requires him to show plain error.

But this he never even tries to do, thus waiving the argument. See Rivera-Carrasquillo, 933 F.3d at 49 n.15.

José also claims that the judge "unfairly" confronted him with a police report to refresh his memory. But the record shows that the prosecutor did that, not the judge (when José gave a nonresponsive answer to the prosecutor's question about his work hours, the judge read him the question again) — something José's brief never convincingly takes on. See Cioffi v. Gilbert Enters., Inc., 769 F.3d 90, 94 (1st Cir. 2014).

José contends as well that the judge showed bias by letting prosecutors present certain testimony about the murder scene, plus photos and a video of Adam's dead body. In his telling, prosecutors had no need for any of that because "there was already sufficient evidence that [Adam] was dead." But the government is generally allowed "to prove its case by evidence of its own choice." See Old Chief v. United States, 519 U.S. 172, 186 (1997). And a judge "is not required to scrub the trial clean of all evidence that may have an emotional impact, where the evidence is part of the [g]overnment's narrative." United States v. Morales-Aldahondo, 524 F.3d 115, 120 (1st Cir. 2008) (quotation marks omitted). Yet José cites no on-point cases and develops no argument that tests the limits of these maxims. And (again) "developing a sustained argument out of . . . legal precedents" is

- 27 -

the party's job.  See Town of Norwood v. FERC, 202 F.3d 392, 405 (1st Cir. 2000).

**B**
**Marcia's and José's Nonwaived Arguments**

We move next to the nonwaived arguments.

Marcia and José pan the judge for asking Adam's business partner Roberto Cacho Perez certain questions during Aurea's lawyer's cross-examination.[11]  Cacho had testified for the government that Aurea "became literally a partner in the business through Adam."  The judge asked — without objection — if "[s]he became that if he died[.]"  And Cacho replied, "Exactly, if he died."  Then — during part of Aurea's lawyer's cross that focused on how the partners funded the projects — the judge asked Cacho if Aurea had money invested in the business.  He responded that "she had no money invested in any project."  "So," the judge said, "she has money if [Adam] dies?," to which Cacho said, "Only."  Marcia's and José's attorneys objected.  But the judge rebuffed them, though he later instructed the jurors that "the [c]ourt occasionally asks questions of a witness in order to bring out facts not then fully covered in the testimony"; that they should "not assume that [the court] hold[s] any opinion on the matters to which [the] questions

---

[11] A real estate developer and investor, Cacho formed a coequal partnership with Adam that developed properties in Puerto Rico.

- 28 -

are related"; and that "it is you, and you alone, who will determine this case, not the [c]ourt." The judge denied the attorneys' motion for a mistrial, concluding that his questions clarified Cacho's testimony and that his limiting instruction minimized any prejudice. The judge also later repeated that just-quoted instruction in his final charge.

Marcia and José describe the judge's questions here as bombshells, establishing Aurea's *motive* to murder Adam. The judge's questions certainly showed — given Cacho's understanding of the partnership and the prenup (which he had personal knowledge of) — that Aurea had no stake in the business *unless* Adam *died*, in which case she would inherit a stake. But the jury already knew this — thanks to the unobjected-to testimony from Cacho, who said that Adam listed the partnership properties in the prenup, which would give Aurea Adam's interest in them on his (Adam's) death. See United States v. Espinal-Almeida, 699 F.3d 588, 608 (1st Cir. 2012) (noting that the judge's interjections "were relatively benign given that the jury had already heard testimony" establishing the same). See generally United States v. Cruz-Feliciano, 786 F.3d 78, 84 (1st Cir. 2015) (explaining that "a question is not improper simply because it clarifies evidence to the disadvantage of the defendant"). Also prompt curative instructions like the judge's here eliminated the potential for

prejudice.  See, e.g., United States v. Ayala-Vazquez, 751 F.3d 1, 25-26 (1st Cir. 2014).  And Marcia and José give us no good reason for why this is not so.

Marcia and José also pan the judge's comment at the end of Roman's brother's testimony.  Roman's brother had testified about getting a letter in which Pabón supposedly copped to killing Adam — a letter the brother made sure the FBI got too.  The judge then said, "I guess you were elated when you read the letter." "Very elated," Roman's sibling revealed.  The defendants objected. Outside the jury's presence, the judge explained his question by saying that "[h]ere we have a gentleman reading a letter that is going to liberate his brother about a crime that he did not do" and that defense counsel would be "wrong" to "think that they are going to make this [c]ourt a piece of furniture."  The judge again told the jurors that "the [c]ourt occasionally asks questions of a witness . . . to bring out facts not then fully covered in the testimony" and that they should "not assume that [it] hold[s] any opinion on the matters to which [its] questions are related."  But in his final charge, the judge instructed the jurors "not to take [the very-elated] statement at all in your determination as to your conferences in the deliberating room because the [c]ourt has eliminated [the] question and [the] answer."

Marcia and José claim that the judge's eliciting the very-elated comment bolstered the letter's credibility as well as Pabón's (Pabón would later testify about the letter's content). The insuperable difficulty for their attacks on the very-elated remark is that the judge struck that exchange from the record — which "sufficed to alleviate any risk of prejudice." See Rivera-Carrasquillo, 933 F.3d at 45. They do say that it was "impossible for a juror to erase from his memory the picture of the judge celebrating [Pabón's] letter as the reason for freeing Roman and for bringing [them and Aurea] to trial." But the jurors-follow-instructions presumption is overcome only if "there is an overwhelming probability that [they] will be unable to follow [them] . . . and a strong likelihood that the effect of the evidence would be devastating to the defendant[s]." Greer v. Miller, 483 U.S. 756, 766 n.8 (1987). And neither Marcia nor José attempt to meet this difficult standard. See Zannino, 895 F.2d at 17.

Marcia and José criticize the judge for using the phrase "repeat performance" as a shorthand to limit repeat questions. As the judge explained to counsel, "Anytime you have an answer, you don't need to go to the answer again. I think the jury heard it, and they know it. . . . That's repeat performances for me." As Marcia and José see it, the judge's repeat-performance comments showed a level of "vituperation" that made the jury believe that

- 31 -

he "thought the defense presented . . . was ludicrous" — that the defense lawyers were mere "actors in a movie and not really defending someone presumed to be innocent." But "because protracted trials drain" precious "judicial resources (judge and jury time, to name just two)," judges enjoy wide discretion to "keep the proceedings moving — by, for instance, making sure evidence presentation does not become rambling and repetitive (to state the obvious, district courts have heavy caseloads and jurors have family and work obligations)." See Rivera-Carrasquillo, 933 F.3d at 45; accord United States v. Perez-Montañez, 202 F.3d 434, 440 (1st Cir. 2000). And what the judge did here fulfilled his affirmative duty to stop this highly contentious multi-defendant, multi-day trial from consuming "needless" amounts of "time." See Fed. R. Evid. 611(a); see also Lanza-Vázquez, 799 F.3d at 143 (commenting that the trial "lasted 18 days and was a massive, multi-defendant conspiracy" prosecution, which the judge "had the authority to move through expeditiously"). Marcia and José protest that the judge used the repeat-performance "admonish[ment]" more with them than with prosecutors. But rather than showing bias, this more reasonably reflects that the judge's "interactions" here "were largely driven by defense counsels' own conduct," see Lanza-Vázquez, 799 F.3d at 143 — the defendants' lawyers spent more time cross-examining the government's witnesses than vice versa and so

tended to ask more repetitive questions, see id. (stressing that a judge "is not a mere moderator, but is the governor of the trial for the purpose of assuring its proper conduct" (quoting Querica v. United States, 289 U.S. 466, 469 (1933))).  And to the extent the defendants further suggest that the judge's demeanor or tone reflects bias — José, for example, says that when his lawyer corrected the judge's recall of testimony, the judge asked counsel if he would "like to take the stand" — we do not believe that the judge crossed legal lines (even if he may have come close to them). See Caramadre, 807 F.3d at 375 (stressing that judge's "'remarks during the course of trial that are critical or disapproving of, or even hostile to, counsel, the parties, or their cases' are usually insufficient to prove bias" — as are "'expressions of impatience, dissatisfaction, annoyance, and even anger'" (quoting Liteky v. United States, 510 U.S. 540, 555-56 (1994))).

José also takes the judge to task for asking if he (José) had worked at The Pink Skirt on September 22, the night Adam died. José had testified that he was on vacation and not at The Pink Skirt on that date but later testified that he had been there that afternoon to set the bar up for the night. José's lawyer asked, "Now, you saw Alex El Loco on September 22, 2005?"  "No," José responded — just before the judge asked (after a sidebar), "[N]otwithstanding that you did work, you didn't see him?"  The

- 33 -

problem for José now is that the judge withdrew the question, in response to the defense's objection — which (again) worked to blunt "any risk of prejudice." See Rivera-Carrasquillo, 933 F.3d at 45.

## V
## Judicial Notice

The defendants argue that the judge erred in taking judicial notice of the fact that he had found Pabón competent to plead guilty in 2008.[12]

As readers by now know, Pabón's testimony at the 2018 trial devastated the defendants' innocence theory because he provided details that no other witness could about how they hired him to kill Adam. After the government's direct examination —

---

[12] The defendants spend only a small fraction of their 300-plus pages of briefing on the judicial-notice issue. And their arguments (below and here) are not a picture of clarity. But we do the best we can with the way we understand them, often quoting at length to avoid any paraphrastic imprecision. We again remind the bar, however, that litigants — on pain of forfeiture — must "spell out [their] arguments squarely and distinctly" before us. See Alston v. Town of Brookline, 997 F.3d 23, 41 (1st Cir. 2021) (quotation marks omitted); see also Rodríguez, 659 F.3d at 175 (noting that "we consider waived arguments 'confusingly constructed and lacking coherence'" (quoting United States v. Eirby, 525 F.3d 31, 36 n.4 (1st Cir. 2008))). It is not our job to develop appellate arguments that they may have had in mind. That is for *them* to do. See, e.g., Rodríguez-Machado v. Shinseki, 700 F.3d 48, 49, 50 (1st Cir. 2012) (per curiam) (observing that "busy appellate judges depend on [the parties] to help bring issues into sharp focus," and adding that "doing [the parties'] work for [them] is not an option" because "that would divert precious judge-time from other[s] . . . who could have their cases resolved thoughtfully and expeditiously").

which brought out how Pabón was testifying under a 2008 plea deal — the judge instructed the jurors that they "should consider his testimony with particular caution."  Pabón, the judge added,

> may have had reasons to make up stories or exaggerate what others did because he wants to help himself.  You must determine whether the testimony of such a witness has been affected by any interest in the outcome of this case, any prejudice for or against the defendants or by any of the benefits he has or may receive from the [g]overnment or the [c]ourt as to his sentence.

Continuing, the judge said that the jurors

> may consider [Pabón's] guilty plea in assessing his credibility, but you are not to consider his guilty plea as evidence that other individual defendants may have participated with him. . . . In other words, the fact that he accepts that he is guilty, that does not mean that the other defendants are guilty. That's for you to decide when all the evidence is in.

(The judge's final charge to the jury included a similar instruction.)

The defense's hours-long cross-examination of Pabón covered lots of subjects — all designed to ruin Pabón's credibility by painting him as a mentally unstable person with an agenda.  The defendants' lawyers, for instance, cross-examined him on his drug doings; community reputation; taste for lying and bragging; past violent acts; and mental-health history, including his psychiatric symptoms and prescribed medications (granting the defendants'

- 35 -

request, the judge took judicial notice that one of Pabón's meds — Risperdal — is "an 'atypical antipsychotic drug' used to treat mental illnesses including schizophrenia, bipolar disease, and irritability associated with autistic disorder"). And at Aurea's lawyer's request, the judge also admitted Pabón's 2008 plea agreement into evidence (the same judge who accepted the 2008 plea agreement ran the 2018 trial).

Not surprisingly, Aurea's attorney focused on the favorable treatment Pabón hoped to get from the government for testifying. Turning to Pabón's plea hearing, her lawyer asked, "At the time, before this judge, were you asked as to your health; mental health?" "Yes," Pabón said, the judge "did, I think." "And," her lawyer continued, "you stated to the [c]ourt here that you, at that time, had been with a psychiatrist because you had depression, correct?" "I think something like that," Pabón answered.[13]

_____

[13] Now is as good a place as any to address José's claim that the judge wrongly kept him from "cross-examining" Pabón about "delusional letters" he wrote to other famous women that he "became infatuated with" (like a former "Miss Universe"). What damages this claim is that he does not provide the necessary record citations or sustained case analysis to back up his "rhetoric" (he cites to one instance where the government objected to a question on *recross*-examination about *one* woman, but his appendix lacks a vital excerpt showing the judge's ruling). See Reyes-García v. Rodríguez & Del Valle, Inc., 82 F.3d 11, 14 (1st Cir. 1996). He does not even offer "any indicium that [his argument] was seasonably advanced and properly preserved in the lower court."

After Pabón left the stand the government (outside the jury's presence) asked the judge to judicially notice that he (the judge) had found Pabón competent to plead guilty in 2008. The government thought that since the defendants "have been allowed to ask and to bring evidence of [Pabón's] mental state and everything," fairness required that the judge note that he had ruled Pabón competent to make a plea. The attorneys for each defendant objected.[14]

"Who put the plea agreement in evidence?" the judge asked. Aurea's lawyer said that he had. And when the judge asked him if he had "protest[ed] the evidence" that he had "put[] on," he answered that he had not. The plea agreement "happened in 2008," the judge noted, and "we are now in 2018." "It's a matter of factfinding by the jury," Aurea's lawyer responded, because "[i]f the jury is told that the [c]ourt made a particular determination," it is "going to put more weight to that, and that is our objection."

---

See id. So his claim "is a nonstarter." See Págan-Lisbon v. Soc. Sec. Admin., 996 F.3d 1, 7 (1st Cir. 2021).

[14] The ensuing discussion between the lawyers and the judge was extensive and not always as clear as we might wish. See generally United States v. Rivera-Morales, 961 F.3d 1, 12 (1st Cir. 2020) (underscoring that appellants must present their arguments "face up and squarely in the court below" to preserve them for appeal). We offer a flavor of it here.

Marcia's lawyer spoke up too and said that granting the government's request would make the jurors think that the judge "believes that [Pabón] is competent, when the truth of the matter is that what the [c]ourt held was that [Pabón] was competent at the time of the change of plea hearing." "What's wrong if I say it that way?" the judge asked — "that he was competent at that time, that date that he pled guilty with me, with this judge."

José's attorney responded that the complained-about information "isn't relevant" because the judge "found [Pabón] competent within the context of the change of plea hearing" in "2008" while "the facts of this case" occurred "in 2005." "And if the [c]ourt states that in 2008 he was found competent . . . it will bring an imprimatur that he was competent upon the jury, when it is the jury that has to decide the issue." Marcia's attorney agreed, stating that "the issue in this case is not whether [Pabón] was competent at his change of plea hearing, but during the events that allegedly took place." But the judge felt that he had "to balance the equities here." "What you wanted," the judge said, was that the plea agreement goes in as a plea agreement, but the fact that he was then competent, you don't want it there." Marcia's counsel then repeated that "[i]nformation pertaining to the process of a change of plea hearing, and that he was found competent[,] is not relevant" to whether "at the time of the events

he was competent."[15]   And he added that he "believe[d] the instruction" would "confuse the jury because the competence that is discussed in the context of" a plea change "is a legal term" — "[i]t is not necessarily a matter related to facts."

"They introduced the [p]lea and [c]ooperation [a]greement," the prosecutor argued right back.   And they asked Pabón "for half an hour all his obligations" and "benefits."   But, the prosecutor added, they now do not want the jury "to hear the [other] half of the story that is inconvenient for them" — that "he was competent" to plead "guilty before the [c]ourt."  Witnesses are presumed "competent to testify," the prosecutor stressed, and "[t]he [d]efense has put this [in] issue."  Responding, Marcia's lawyer argued that when the judge — "the highest authority in this room" — talks, the jurors "might think" that "the [c]ourt has already found him competent."  What the government wants, Marcia's attorney claimed, "is to . . . influence the jury that [Pabón] is of a state of mind different to that that was presented to them" during the direct and cross-examinations.

---

[15] We have no idea why Marcia's and José's lawyers kept talking about Pabón's competency at the time of Adam's murder.  And we suspect the judge had no idea either.  That is because criminals can commit crimes while incompetent — they just cannot (generally speaking) face certain criminal processes since incompetents cannot make a defense.  See Indiana v. Edwards, 554 U.S. 164, 170 (2008).

- 39 -

Aurea's counsel jumped back in and noted why she had questioned Pabón about the plea hearing. Pabón had answered "yes" when asked at the plea proceeding whether he had had "psychiatric treatment," her lawyer said. So "we cross-examined him extensively on that issue, because there is a record after that . . . plea [hearing] of years of [him] saying that he is not well, and taking X, Y, and Z for years." Making this point again, Aurea's attorney said that "[f]or years [Pabón] took medicines, treatment, and he himself asked for it, saying that he heard voices, saying that he saw things" — which "is why we went into that issue."

At the end of the government's case the judge took judicial notice and advised the jury that

> on June 13, 2008, [Pabón] entered a plea of guilty in Criminal Case Number 08-216, which is this case. During the plea and at the end of the hearing, the [c]ourt found [Pabón] competent and capable of entering an informed plea on this date.

The judge repeated that instruction in his final charge. And after telling the jurors that witness credibility was entirely a matter of their judgment — and thus they did "not have to accept the testimony of any witness if" they found the witness "not credible" — the judge instructed the jurors that "the final decision whether

or not to accept" a judicially noticed fact was theirs "to make" and that they did not have "to agree with the [c]ourt."[16]

Forgoing any relevance-based grounds on appeal, the defendants use different legal frameworks here to contest the judge's taking judicial notice of Pabón's competency to plead guilty. Aurea characterizes her challenge as one of instructional error (focusing on the judge's final charge), Marcia's as part of a broader pattern of judicial bias, and José's as one of evidentiary error. The standard of review applicable to each of those challenges is abuse of discretion. See United States v. Cantwell, 64 F.4th 396, 409-10 (1st Cir. 2023) (instructional challenge); Raymundí-Hernández, 984 F.3d at 145 (judicial-bias challenge); United States v. Vázquez-Soto, 939 F.3d 365, 373 (1st Cir. 2019) (evidentiary challenge). Noting that the root cause of the claimed error is the judge's judicial-notice taking, the government treats the defendants' attacks as a freestanding judicial-notice challenge — which also gets abuse-of-discretion review. See United States v. Bello, 194 F.3d 18, 23 (1st Cir. 1999). No party disagrees with the government's approach. So we follow that approach too.

---

[16] For what it is worth, the defendants had argued that "[t]he first thing the [g]overnment will do in closing" will be to "say, hey, members of the jury, the judge said that [Pabón] was competent." But the government did nothing of the sort.

A judge may judicially notice an "adjudicative fact" —
*i.e.*, a fact that is "particularly related" to the parties'
proceeding — if the fact is "not subject to reasonable dispute" in
that it is either "generally known within the trial court's
territorial jurisdiction" or "can be accurately and readily
determined from sources whose accuracy cannot reasonably be
questioned." See Fed. R. Evid. 201(b).[17]  In a criminal case, a
judge who judicially notices an adjudicative fact must "instruct
the jury that it may or may not accept the noticed fact as
conclusive."  See id. 201(f).  This rider protects the jury's
traditional right to discount even an uncontested fact in reaching
a verdict and so prevents the judge from violating a defendant's
constitutional jury right by directing a verdict on that fact.
See, e.g., United States v. Dávila-Nieves, 670 F.3d 1, 8 (1st Cir.
2012); Bello, 194 F.3d at 25.

---

[17] The "particularly related" quote comes from a leading legal
dictionary.  See Black's Law Dictionary (11th ed. 2019) (look up
"adjudicative fact," which says "SEE FACT"; go to "fact," which
provides a definition of "adjudicative fact").  Our caselaw says
that "[a]djudicative fact is . . . a fuzzy concept (indeed, there
is more than one usage, and [Evidence] Rule 201's advisory
committee notes do little more than borrow — and may well
misconceive — . . . several formulations: *e.g.*, facts concerning
the immediate parties." United States v. Hilton, 257 F.3d 50, 55
(1st Cir. 2001).  But no one doubts that the judge here judicially
noticed an adjudicative fact.  See generally United States v.
Bauzó-Santiago, 867 F.3d 13, 23 (1st Cir. 2017) (holding that a
fact on the docket "is a proper subject of judicial notice").

The defendants do not contest the fact that in 2008 the judge found Pabón competent to plead guilty (a transcript of Pabón's plea hearing appears in the joint appendix filed in this appeal). Nor do they dispute that this fact clearly appears in the court's records. Instead they contend that the judge's judicial-notice taking "placed the prestige of the [c]ourt behind the mental competence of Pabón" and so endorsed his "credibility and bolstered his testimony" in 2018. And pointing to the judge's "I have to balance the equities" comment, they suggest that the notice offset their bid to destroy Pabón's "credibility" on cross by "impermissibly" presenting his "competen[cy]" "as a proven fact" that the jury "could not" contest. But their thesis rests on an incorrect premise — namely, that by judicially noticing Pabón's *competency* to plead guilty in *2008*, the judge vouched for the *credibility* of Pabón's trial testimony a decade later in *2018*. Explaining why we think this will require a bit of unpacking (please bear with us).

Competency and credibility are different concepts in important respects. <u>Compare</u> *Competency*, Black's Law Dictionary (11th ed. 2019) (defined as "[t]he mental ability to understand problems and make decisions," which in the criminal-law context includes a defendant's "fitness to plead" or "to stand trial"), <u>and</u> *Competence*, <u>id.</u> (defined as "[a] basic or minimal ability to

- 43 -

do something; qualification, esp[ecially] to testify"),[18] with *Credibility*, Black's Law Dictionary (11th ed. 2019) (defined as "[t]he quality that makes something" — like "a witness" — "worthy of belief"), and *Witness*, sub-definition for "credible witness" (defined as "[a] witness whose testimony is believable"). One can be competent to testify yet still testify with no credibility, for example. Competency (if contested) is for the judge, not the jury. See United States v. Devin, 918 F.2d 280, 291-92 (1st Cir. 1990). But credibility is for the jury, not the judge.[19] See United States v. Alicea, 205 F.3d 480, 483 (1st Cir. 2000).

> Now give the at-issue judicial notice another read:
>
> [O]n June 13, 2008, [Pabón] entered a plea of guilty in Criminal Case Number 08-216, which is this case. During the plea and at the end of the hearing, the [c]ourt found [Pabón] competent and capable of entering an informed plea on this date.

What jumps out is that in giving the jury context for the plea's acceptance despite (as the defense showed) Pabón's getting psychiatric treatment then, the judge carefully limited the notice

---

[18] See generally District of Columbia v. Arms, 107 U.S. 519, 521-22 (1883) (stating that even "a person affected with insanity is admissible as a witness if he has sufficient understanding to apprehend the obligation of an oath, and to be capable of giving a correct account of the matters which he has seen or heard in reference to the questions at issue") (cleaned up).

[19] If anyone is wondering, no defendant questioned Pabón's competency to appear as a witness or moved to strike his testimony.

to Pabón's *plea competency* in *2008 — i.e.*, to his "entering an informed plea *on th*[*at*] *date*" (emphasis added). The judge said nothing about Pabón's *trial credibility* in *2018 —* the phrase "trial credibility in 2018" (or one like it) is nowhere to be found there. So Pabón's trial credibility still remained a disputed fact.

Yet the defendants still think that the judge's notice "convey[ed] to the jurors that [Pabón] was not crazy," when he instead "should have allowed the jury to come to its own conclusion." But their claim butts up against the judge's explicit instructions that the jurors (and they *alone*) remained the evaluators of witness credibility and so did not "have to accept the testimony of any witness" they found "not credible."[20] And

---

[20] Under the heading "Number of witnesses," the judge instructed the jury in part:

> You do not have to accept the testimony of any witness if you find the witness is not credible. You must decide which witnesses to believe and which facts are true. To do this, you must look at all the evidence, drawing upon your common sense and personal experience.

> You may want to take into consideration such factors as the witnesses' conduct and demeanor while testifying; their apparent fairness or any bias they may have displayed; any interest you may discern that they may have in the outcome of the case; any prejudice they may have shown; their opportunities for seeing and knowing the things about which they testified; the reasonableness or unreasonableness of the events that they have related to you in their testimony; and any other facts or circumstances disclosed by the evidence that tend to corroborate or contradict their versions of the events.

these instructions — which the law presumes they followed, <u>see</u> <u>United States</u> v. <u>Stewart-Carrasquillo</u>, 997 F.3d 408, 423 (1st Cir. 2021) — did not carve out an exception for Pabón.

As if to make this more emphatic, both the government *and* the defense (seemingly following the judge's lead) acted like Pabón's credibility — his *believability* — remained a question for the jury even *after* the judge gave the disputed notice.  A prosecutor, for example, told the jurors during closing argument

---

And under the heading "Credibility of witnesses," the judge instructed the jury as follows:

> In deciding what the facts are, you may have to decide what testimony you believe and what testimony you do not believe.  You may believe everything a witness says or only part of it or none of it.  In deciding what to believe, you may consider a number of factors, including the following:  The witness' ability to see or hear or know the things the witness testifies to; number two, the quality of the witness' memory; number three, the witness' manner while testifying; four, whether the witness has an interest in the outcome of the case or any motive, bias or prejudice; five, whether the witness is contradicted by anything the witness said or wrote before the trial or by other evidence; and six, how reasonable the witness' testimony is when considered in light of other evidence which you believe.

> You are to judge the credibility of all witnesses fairly and reasonably, and you are to consider any interest that each of them may have in the outcome of the case in determining the weight to be given to their testimony.

> Therefore, after evaluating all the evidence, and a particular witness' testimony pursuant to this instruction, you have three choices:  You believe him or her totally; you reject his or her testimony totally or; you believe him or her partially.

that "[i]t is *your duty to adjudge credibility* and determine what to believe" (emphasis added) — without excepting Pabón.  Not to be outdone, a defense lawyer told them that "Alex El Loco" had "no *credibility*" but "that is *up to you to decide*" (emphases added). The defense's closings also pushed the crazy-Pabón-has-no-credibility theme with gusto, telling the jurors that "Alex El Loco" "is a fantasiz[ing]" "psychopath" who is "detached from reality," "was prescribed psychotic drugs" for a very long time, and "*does not deserve an iota of credibility*" — so "[t]*ake care when you weigh his testimony*" (emphases added).  Which caused a prosecutor during rebuttal closing argument to highlight evidence "corroborat[ing]" Pabón's "testimony" (the prosecutor's words, not ours), a significant development that — because "[c]orroboration goes to credibility," see <u>Robinson</u> v. <u>Pezzat</u>, 818 F.3d 1, 9 (D.C. Cir. 2016) — further shows how everyone (the judge, the government, *and* the defense) believed Pabón's credibility remained a live issue for the jury even *after* the judge gave the contested notice.

The defendants' briefs might be read to say that the jury did not know the difference between competency and credibility.  José, for example, claims that the judge botched things by not instructing the jury "what it meant to be found competent to plead guilty."  Damaging to their position, however, is that they give us no sign that they ever asked the judge to

- 47 -

instruct the jury on the difference between competency and credibility. Anyway, any confusion about the scope of the judicial notice got straightened out by the judge's multiple charges to the jurors (which the law assumes they obeyed, as we keep saying, see Stewart-Carrasquillo, 997 F.3d at 423), like how they "should consider [Pabón's] testimony with *particular caution*" and how they remained the *sole deciders* of witness credibility, meaning they — as the exclusive finders of fact — did "*not* have to accept the testimony of *any witness*" (no Pabón carve-out exception) if they found the witness "not credible" (emphases added). And even after those instructions, the defendants (as we just intimated) still did not ask the judge to clarify the difference between competency and credibility.

So on this record we cannot say that the judge's judicial notice represents an abuse of discretion — which would require us to hold that "no reasonable person" could have done what this judge did.[21]  See Rivera-Carrasquillo, 933 F.3d at 44.

---

[21] Since we reject the defendants' arguments on these grounds, we need not reach (and take no position on) the government's additional claim that we can uphold the judge's action because he repeatedly told the jurors that they could — per Evidence Rule 201 — disregard any judicially noticed fact. See generally PDK Labs. Inc. v. DEA, 362 F.3d 786, 799 (D.C. Cir. 2004) (Roberts, J., concurring in part and concurring in the judgment) (declaring that "if it is not necessary to decide more, it is necessary not to decide more").

Siding with the defense, the dissent raises some concerns.[22] But they do not change the outcome.

The dissent dismisses our mentioning how the judge directed the jurors to a specific moment in time — 2008, *not* 2018 — involving a specific subject — competency, *not* credibility — and later instructed that they should view Pabón's testimony with special care and could reject "*any* witness['s]" account as the absolute arbiters of witness credibility (emphasis added). In the dissent's telling, the judge's "intervention . . . created the unacceptable risk that the jurors understood the . . . notice of the [2008] competency finding to reflect the . . . judge's view that Pabón's mental illness did not make" his 2018 trial testimony "untrustworthy — regardless of the jur[or]s' perception of his [2018] performance on the witness stand." In other words, "[b]y instructing the jury on its finding of Pabón's competence in 2008, the judge was inescapably telling the jury that [that] finding was relevant to the jury's evaluation of Pabón's credibility at trial" in 2018 — or so the dissent believes.

Two responses. One is that — as we showed five paragraphs above (beginning "As if to make this more emphatic . . .") — *everyone* operated below on the view that the credibility

---

[22] The "dissent" refers to the opinion that follows ours, concurring in part and dissenting in part.

- 49 -

of *all* witnesses remained a jury question even after the judge gave the challenged notice. Another — deeply embedded in our jurisprudence (and this should sound familiar by now) — is that jurors can and do make distinctions among the different issues at trial and follow judges' instructions, see Stewart-Carrasquillo, 997 F.3d at 423 — including those saying that *they* decide who is credible, based on factors like *their* perception of a witness's "ability to see or hear or know the things the witness testifies to" and "the witness'[s] manner while testifying" (quotes pulled from the instructions displayed a few footnotes ago). Our bottom-line view is that the judge's instructions could not be any clearer that the jurors got to make all *credibility* decisions and that the judicial notice's mention of Pabón's *competency* concerned only a finding of his *competency* when he pled guilty in 2008. And (allow us to say again, because it bears repeating) if the defendants felt that the credibility instructions might mystify the jurors when paired with the notice's competency reference, then it was on them to ask for clarification on the difference between credibility and competency. Yet they never did.

The dissent next claims that the-jurors-decide-credibility charge could not "cure the harm from the" judge's "error." And as support, the dissent leans on Raymundí-Hernández.

But there are important night-and-day differences between that case and the defendants'.

Among other "intercessions," see 984 F.3d at 154, the district judge there said "before the jury" that the testimony of a then-testifying defense witness "[wa]s not relevant," id. at 147. Raymundí-Hernández did hold that "where the reliability of witness testimony is so strongly implicated . . . 'such interference with jury fact-finding cannot be cured by standard jury instructions,'" id. at 153-54 (quoting United States v. Tilghman, 134 F.3d 414, 421 (D.C. Cir. 1998)) — including instructions saying that witness credibility is for the jury, see id. at 149-50. But Raymundí-Hernández did *not* involve judicial notice. Plus nothing like the fact-finding interference that happened there happened here, where (as we have been at pains to stress) the judge's words focused the jurors on Pabón's plea *competence* in *2008 — not* his testimonial *credibility* a decade later in *2018*.[23]

The dissent tries to downplay the significance of the lawyers' "treat[ing] Pabón's credibility as a live issue" during closing arguments, writing that "[i]t is certainly no surprise"

---

[23] Perhaps we should say that no one argues here that the judge violated Evidence Rule 403 (recall the probative worth/unfair prejudice analysis discussed above) by judicially noticing Pabón's plea competency in 2008.

- 51 -

that they "argued that point." As the dissent sees it, "[t]he problem with the judicial notice in this case is not that the district court entirely preempted the jury's factfinding on Pabón's credibility, but that it weighed in on the government's behalf." But that theory depends on the same plea-competency-in-2008-implicates-testimonial-credibility-in-2018 idea that we cannot accept, for the reasons already given.

And that is that for the judicial-notice matter (though we should add that because we see no abuse of discretion, we — unlike the dissent — need not run through harmless error here).

## VI
## Constructive Amendment and Prejudicial Variance

Aurea claims that the government's closing arguments and the judge's jury instructions constructively amended the indictment. Marcia claims that the government's proof constructively amended or prejudicially varied from the indictment.

A constructive amendment (roughly speaking) occurs when either the government (typically through evidence presentation or argument) or the judge (typically through jury instructions) changes the indictment's terms to the point that the defendants are "effectively charged with" a crime different from "the one returned by the grand jury." See United States v. Katana, 93 F.4th 521, 530 (1st Cir. 2024); see also United States v. Condron, 98

F.4th 1, 24 (1st Cir. 2024).  A prejudicial variance (also roughly speaking) occurs when there is a difference between the facts charged and the facts proved that affected the defendants' "substantial rights," say by surprising them at trial or by exposing them to the risk of double jeopardy.  See Condron, 98 F.4th at 24-25; see also Katana, 93 F.4th at 530.

## A
## Aurea's Arguments

Aurea presents two constructive-amendment arguments.

The first argument is that the government's comment in closing arguments that cellphones and cars are facilities of interstate commerce shows a "changed . . . theory as to the interstate commerce facility."  Exactly how Aurea does not clearly say.  But as the government notes without contradiction, this is an unpreserved contention that prompts (at most) plain-error review.  See United States v. McBride, 962 F.3d 25, 31 (1st Cir. 2020).  And because Aurea "do[es] not tie this unpreserved . . . argument to the demanding plain-error standard," she has "waived it."  See Rivera-Carrasquillo, 933 F.3d at 49 n.15.

The second argument — which the parties treat as preserved (and so will we) — is that the judge instructed the jurors that Aurea stood trial only for the counts in the original indictment but that they could consider overt acts alleged in the second superseding indictment.  Put aside that she identifies no

overt acts in the second superseding indictment that would fundamentally alter the charging terms of her indictment. Her claim at bottom rests on the idea that the jury could have convicted her under the second superseding indictment rather than the first. But the judge's repeated instructions — which we presume the jury followed, see Chisholm, 940 F.3d at 129 — that Aurea faced trial on the original indictment throw cold water on that proposition.

## B
## Marcia's Arguments

Marcia contends that Pabón's testimony that she was at El Hamburger — which the second superseding indictment does not specifically mention — constructively amended or prejudicially varied from the operative indictment.[24]

Starting with Marcia's constructive-amendment claim, the government again says without pushback that she did not preserve that theory. Which means review is (at best) for plain error. See United States v. DeCicco, 439 F.3d 36, 44 (1st Cir. 2006). But by making no effort to show plain error, she waived it. See Rivera-Carrasquillo, 933 F.3d at 49 n.15.

---

[24] Among the many overt acts alleged, the indictment said that Aurea and José "met with Pabón . . . at a restaurant in Puerta de Tierra" — El Hamburger — on September 21, 2005, "and proposed that [he] murder [Adam], in exchange for" $3 million.

And Marcia's prejudicial-variance theory — which the parties treat as preserved (and so will we) — goes nowhere too. An indictment (as we intimated at the beginning of this discussion) must say enough so a defendant knows the charges and can plead double jeopardy in any later prosecution for the same crime. See, e.g., Katana, 93 F.4th at 530. But prosecutors need not list all of their evidence in the indictment. See, e.g., United States v. Marrero-Ortiz, 160 F.3d 768, 773 (1st Cir. 1998). Nor must they limit themselves at trial to the overt acts in that document. See id. Getting back to this case, the second superseding indictment gave Marcia notice that prosecutors would present evidence of her meeting with Pabón before Adam's murder. As a "manner and means" of the conspiracy, the indictment stated (emphasis ours) that Aurea, Marcia, and José "approach[ed] . . . Pabón . . . , and propose[d] that he murder" Adam and "met with Pabón . . . *on several occasions*, . . . to discuss the particulars of the murder for hire." The indictment also alleged as an overt act that on September 21, 2005 — the date of the El Hamburger meet-up — Aurea, Marcia, and José "agreed that Pabón . . . would be notified of the specific location, date, and time of the murder of [Adam]." And the statement of facts in Pabón's plea agreement — submitted as an exhibit below — said (again emphasis ours) that Aurea, Marcia, and José "*all* boarded Aurea's SUV . . . and drove to a nearby

restaurant in Puerta de Tierra known as El Hamburger."  So because Marcia "cannot credibly claim surprise," her variance argument fails for lack of prejudice.  See id.; see also United States v. Rivera-Donate, 682 F.3d 120, 130 (1st Cir. 2012) (making a similar point in rejecting a variance argument because "[a]lthough the indictment did not spell out every single location at which activities related to the conspiracy took place, it gave a sufficient description of the manner and means of the same to put [the defendant] on notice of the charges against him").

## VII
## Death Resulted

The defendants also ask us to vacate their sentences because the judge did not have the jury specifically find that a death resulted from the murder-for-hire scheme.

The murder-for-hire statute punishes offenders on a sliding scale.  If no injury occurs, they can get up to 10 years in prison.  If an injury does occur, they can get up to 20 years in prison.  And if death occurs, they can get death or life in prison.  See 18 U.S.C. § 1958(a).  The defendants are right that other than the fact of a prior conviction, any fact that controls minimum and maximum sentences must be alleged in the indictment and found by the jury beyond a reasonable doubt.  See United States v. Rabb, 5 F.4th 95, 104 (1st Cir. 2021); see also Burrage v.

United States, 571 U.S. 204, 210 (2014). But they are wrong to think that their argument is a winner.

Using the more defendant-friendly harmless-error standard (rather than the less defendant-friendly plain-error model), see United States v. Pizarro, 772 F.3d 284, 296-97 (1st Cir. 2014), we "conclude[] beyond reasonable doubt that the omitted" death-results "element was uncontested and supported by overwhelming evidence, such that the jury verdict would have been the same absent the error," see id. at 297-98 (quotation marks omitted). The operative indictments charged the defendants with conspiring to commit murder for hire "result[ing]" in "the death of Adam Joel Anhang Uster." The judge read the indictments to the jury during his preliminary and final instructions, including the allegations that the death of Adam resulted. And as reflected on the verdict forms, the jury found each defendant guilty "as charged." But put that away. The defendants conceded at trial that Adam died at Pabón's hands. Lawyers for Aurea and Marcia, for example, told the jury in their opening statements that "[t]he evidence will show that Adam died" (Aurea's lawyer) and that Pabón "brutally murdered Adam" (Marcia's lawyer). And to give another example, counsel for each defendant relied on this concession to convince the judge to limit the government's use of a murder-scene video that showed Adam's dead body lying on the street. A

representative quote is Aurea's lawyer's saying that because "[t]here is no issue" that Adam "is dead," the video need not come in. More, Pabón testified about how he took Adam's life; a forensic pathologist testified about how Adam died; a lawyer testified about how Aurea sued Adam's parents to recover her claimed share of her "deceased" husband's estate; and José testified about how he felt after learning of Adam's death (among other evidence). And more still (as the judge noted at sentencing), *no* witness testified that Adam did *not* die. See United States v. Razo, 782 F.3d 31, 40 (1st Cir. 2015) (concluding that "a 'reasonable jury necessarily would have found an aggravating [drug-quantity] element beyond a reasonable doubt' even though it was not asked to do so," noting that the defendant "point[ed] to no evidence contradicting the drug quantities testified to at trial" and never "assert[ed] that he was responsible for a lower quantity" (quoting Pizarro, 772 F.3d at 296)).

Trying to distinguish his case from Pizarro, José says (emphasis ours) that there was "no overwhelming evidence about his *participation* in the murder." Marcia seems to make a similar argument for herself. But the harmless-error analysis here focuses on the omitted aggravating element that a death resulted from the charged crime, not on other elements of the offense.

## Mental Health

Aurea, Marcia, and José contest a bunch of post-trial rulings rejecting claims for relief based on Pabón's mental health.

### A
### Background

To get to the issues we must first sort through a fairly complicated procedural history (some of which we have already touched on).

Pabón pled guilty in June 2008 to conspiring to commit murder for hire resulting in Adam's death. Because his sentence depended on his "substantial assistance to the United States and [his] truthful testimony" in the defendants' case, particularly after "the cross-examination and all of the evidence," the judge did not set a sentencing date (again, Pabón's sentencing judge was the defendants' trial judge).

The defendants' trial began and ended in 2018. They got sentenced in 2019. And they timely appealed their convictions and sentences. Pabón remained unsentenced because his lawyer had concerns about his competency (a defendant must be competent at all stages of the prosecution, including sentencing, see Drope v. Missouri, 420 U.S. 162, 181 (1975)). What happened was Pabón sent letters to José's and Aurea's lawyers in June 2019 (about three months after the defendants' sentencings) promising "helpful"

information for each client's appeal.  At Pabón's lawyer's *ex parte* request the judge in July 2019 issued an *ex parte* order for a competency evaluation.

Aurea, Marcia, and José later learned about the *ex parte* order and the letters that had triggered it.  They also learned that before trial Pabón had told prosecutors "in a very excited fashion that he did not want to cooperate[;] that he had had a plan all along that he was going to break the plea agreement in court[;] and that he was not wanting to cooperate any longer" — information prosecutors shared with the judge (in an *ex parte* sidebar at trial), but not with the defendants.

The defendants then asked us in September 2019 to remand their pending appeals so that the judge could assess Pabón's letters — which they described as "impeachment evidence."  They also argued that the government's "fail[ure] to disclose [this] evidence at trial, which appear[ed] to be related to [Pabón's] lack of competence," had not been "presented below" and "should be first addressed by the [d]istrict [c]ourt."

Before we ruled on that remand motion, the Bureau of Prisons ("BOP") in September 2019 released its court-ordered competency evaluation of Pabón.  The psychologist diagnosed him with "Schizophrenia, Continuous."  According to the psychologist, Pabón was "experiencing symptoms of a psychotic disorder that do

substantially impair his present ability to understand the nature and consequences of the court proceedings brought against him, and substantially impair his ability to properly assist counsel in a defense." The psychologist also noted that in November 2008, Pabón had been diagnosed with "Schizophrenia, Delusional Type" while in BOP custody. And the psychologist ultimately "recommended that [Pabón] be transferred to a federal medical center for competency restoration treatment." Acting on Pabón's counsel's motion, the judge ordered Pabón to undergo that treatment.

Days after the evaluation's release, we denied the defendants' remand motion in October 2019, but "without prejudice to [their] following the procedures set forth in Fed. R. Crim. P. 37 and Fed. R. App. P. 12.1."[25]

---

[25] Fed. R. Crim. P. 37 provides:

> (a) **Relief Pending Appeal.** If a timely motion is made for relief that the court lacks authority to grant because of an appeal that has been docketed and is pending, the court may:
>
> (1) defer considering the motion;
>
> (2) deny the motion; or
>
> (3) state either that it would grant the motion if the court of appeals remands for that purpose or that the motion raises a substantial issue.
>
> (b) **Notice to the Court of Appeals.** The movant must promptly notify the circuit clerk under Federal Rule of Appellate Procedure 12.1 if the district court states

In November 2019 — more than a year after their trial — the defendants filed motions for indicative rulings under Criminal Rule 37.  Marcia sought an indicative ruling on a new-trial motion alleging the government had violated its duties under Brady v. Maryland, 373 U.S. 83 (1963), by withholding Pabón's prison medical records (including his 2008 schizophrenia diagnosis) and had ignored its obligations under Giglio v. United States, 405 U.S. 150 (1972), by suppressing the "impeachment evidence."  Because

---

that it would grant the motion or that the motion raises a substantial issue.

(c) **Remand.**  The district court may decide the motion if the court of appeals remands for that purpose.

And Fed. R. App. P. 12.1 says:

(a) **Notice to the Court of Appeals.**  If a timely motion is made in the district court for relief that it lacks authority to grant because of an appeal that has been docketed and is pending, the movant must promptly notify the circuit clerk if the district court states either that it would grant the motion or that the motion raises a substantial issue.

(b) **Remand After an Indicative Ruling.**  If the district court states that it would grant the motion or that the motion raises a substantial issue, the court of appeals may remand for further proceedings but retains jurisdiction unless it expressly dismisses the appeal.  If the court of appeals remands but retains jurisdiction, the parties must promptly notify the circuit clerk when the district court has decided the motion on remand.

Aurea — and *only* Aurea — had gotten Pabón's prison medical records before trial (unlike the other defendants, she had served the BOP with a subpoena after the judge had ordered the records turned over), she sought an indicative ruling on a new-trial motion claiming "newly discovered evidence" about Pabón's mental health after the trial and accusing the government of defying Brady/Giglio by not producing the "impeachment evidence." Marcia and Aurea also argued that they had a right to an independent psychiatric examination of Pabón, post-trial discovery, and an evidentiary hearing. José joined their motions.

The following month — December 2019 — we granted the defendants' motion to stay their pending appeals in their criminal case. Of note, our order directed them to "file status reports every thirty days advising [us] of the status of the pending district court motions for indicative rulings."

The judge denied all the indicative-rulings motions in February 2020. But he then granted the defendants' motions to extend the "deadline" to file a reconsideration motion from March 6 to March 20, 2020. Responding to the Covid-19 pandemic, the District Court of Puerto Rico issued an order saying that "all deadlines originally set from March 16, 2020, to and including April 9, 2020 are extended until April 10, 2020."

The defendants filed status reports with us a little later, informing us about the judge's ruling.

Then on April 30, 2020, Marcia moved the judge for reconsideration and an evidentiary hearing. But the judge denied that "extremely overdue" motion on May 1, 2020, noting that Marcia had filed it "twenty days after the expiration of the District Court's mandated extension of deadlines." José moved three days later to join Marcia's untimely reconsideration motion. And the judge denied that motion too.

But those were not the only things that happened in May 2020. Aurea moved the judge for post-trial discovery on the "same matter" raised in her previously denied indicative-rulings bid — a motion Marcia and José joined as well. Before the judge ruled on that request, José appealed the February 2020 denial of the indicative-rulings motions. The judge then denied the post-trial-discovery motion. And Aurea and Marcia filed amended notices of appeal that same day. Aurea's amended notice challenged "all motions[] filed after the filing of [her] original notice of appeal" and "motions where a joinder was requested" but was "denied." Marcia's amended notice challenged "the district court's denial of "her . . . motions for [i]ndicative [r]ulings and her motion for reconsideration and its denial of a motion for post-conviction discovery, which [she] joined, among others."

The BOP completed Pabón's court-ordered competency-restoration treatment in June 2020. The psychologist diagnosed him with "antisocial personality disorder" but found he was "competent to proceed to" sentencing. That same month we lifted the "stay of appellate proceedings" given "the conclusion of the district court proceedings related to defendants' motions for indicative rulings."

After getting the June 2020 evaluation, Marcia moved the judge in August 2020 for an indicative ruling on a request for the appointment of an independent psychiatrist to evaluate Pabón, post-trial discovery of all documents "in the possession of the . . . BOP [p]sychologists," and an evidentiary hearing. The judge denied the motion the same day. And Marcia appealed that denial.

Taking a page from Marcia, Aurea moved the judge in September 2020 for an indicative ruling on a request that essentially mirrored Marcia's. The judge denied that motion too. And Aurea appealed that denial.

This brings us to October 2020. Concerned that José's May 2020 appeal might be untimely under Fed. R. App. P. 4(a)(1)(B), we ordered him "to move for voluntary dismissal of the appeal . . . , or to show cause, in writing, why this appeal should not

- 65 -

be dismissed."[26]  José then dismissed his May 2020 appeal and filed a document in his appeal from the criminal trial asking us to "take notice" of the judge's February 2020 denial of the indicative-rulings motions.

December 2020 saw a flurry of activity.  José asked us if he could file a separate addendum under seal in the appeal from his criminal trial.  We granted his request but said that "[t]he merits panel w[ould] decide whether to consider the post-conviction orders contained in the supplemental addendum, which post-date defendant's direct appeal."  Back in the district court Pabón's lawyer told the judge that Pabón had acted in ways that suggested he "may again be incompetent" to help his "defense."  As support, counsel pointed to a letter Pabón had written him and the judge, which (in relevant part and reproduced as it appears in the record) began:

> I:  Alex Pabón Colón — star witness in the case of the Canadian multi-millionaire investor, ask for a new trial against the defendants.  I know that I will be sentenced on December 16, 2020, and that I will be present that day since I am asking the

---

[26] Fed. R. App. P. 4(a)(1)(B) requires that a defendant in a *civil* case file a notice of appeal within *sixty* days of the judgment or order appealed from.  Our order should have referred to Fed. R. App. P. 4(b)(1)(A), which requires that a defendant in a *criminal* case file a notice of appeal within *fourteen* days of the judgment or order appealed from.  But José's notice of appeal was late under either rule.

Honorable federal judge, Daniel Domínguez that he see a new trial.

Pabón added:

I admit there are two powerful families that have been putting a lot of pressure on me since the beginning of the case, even more so when I was asked to testify in the case in federal court, and those people that have been strongly pressuring me I strongly suspect that they have contracts with persons from my past.

Pabón continued:

I will need the federal authorities, the F.B.I., to conduct a full investigation by intercepting the calls they make from the first moment I sit to testify as well their emails up to this day. To me, my life has been full of worries since the moment these families have been harassing me. I will not show up on . . . the day of my sentencing. Because I want a new trial to be held to demonstrate to the court and the whole world everything that has happened to me.

And Pabón ended:

Therefore, please Counsel . . . don't insist on calling me for video conferences, because I will not attend, at my own expense. I am sick and tired of being harassed and I feel deceived in this case, which has been a nightmare to me. Enough abuse and I want a new trial.

The judge postponed Pabón's previously scheduled sentencing hearing "until such time as [Pabón could] be mentally evaluated."

Pointing to that letter Marcia asked the judge at December's end for "permission to file a motion" under Criminal Rule 37 "to request an evidentiary hearing . . . because of newly

- 67 -

discovered evidence."  Aurea and José joined her motion.  Before deciding that motion, the judge granted Pabón's lawyer's request and ordered the BOP to evaluate Pabón's competency for a third time.

As the calendar turned to January 2021 Aurea again asked the judge to appoint an independent psychiatrist to examine Pabón.  And she "incorporate[d] the argument made in [her] previous filings."  The judge denied that motion.  And Aurea appealed that denial (she also purported to appeal the denial of her end-of-December motion, even though the judge would not deny it until April 2021).

Because the BOP did not conduct the third competency evaluation swiftly enough, the judge issued an order in April 2021 telling the agency to get to it.  And the defendants jointly asked us to have the judge appoint an independent psychiatrist to evaluate Pabón and hold an evidentiary hearing to see if his "lack of competence and deficits in his ability to make rational decisions was of such importance that it should have been considered by the jury."

That takes us to July 2021.  The BOP issued its third competency evaluation.  The psychologist again diagnosed Pabón with "antisocial personality disorder" but found he "[did] not currently have a mental disease or defect that would render him

unable to understand the nature and consequences of the proceedings against him or to assist properly in his defense."  A little later we denied the defendants' April 2021 motion pending before us (the one asking us to direct the judge to appoint an independent psychiatrist and conduct an evidentiary hearing) and told them to "place all of their appellate arguments and requests for relief in their opening briefs."

Another detail worth noting is that in April 2022 the judge sentenced Pabón to 228 months in prison plus 4 years of supervised release.

**B**
**Arguments and Analysis**

Against this intricate backdrop, the defendants (some or all of them) present three groups of concerns for us to address. The first involves Pabón's 2019 competency evaluation, his 2019 letters to counsel, and the government's supposed Brady/Giglio infractions — issues that come here via the defendants' appeals from both the judge's denial of certain post-trial motions and their direct appeals from their criminal trial.  The second involves Pabón's 2020 competency evaluation and his 2020 letter to his lawyer and the judge — issues that come here via Aurea's and Marcia's appeals from the judge's denial of their post-trial motions.  And the third involves Pabón's 2021 competency evaluation — issues that come here via the defendants' direct appeals from

- 69 -

their criminal trial.  For easy reference we label these groups (commonsensically but perhaps somewhat unimaginatively) as "First Group," "Second Group," and "Third Group." [27]

## 1
## First Group

We begin with the defendants' challenges involving Pabón's 2019 competency evaluation, his 2019 letters to counsel, and the government's alleged Brady/Giglio violations.

The defendants' initial attack centers on the judge's February 2020 denial of their post-trial requests under Criminal Rule 37 for indicative rulings on motions seeking (a) a new trial based on Brady/Giglio; (b) a new trial based on Pabón's 2019 competency evaluation and his 2019 letters to counsel; (c) the appointment of an independent psychiatrist to evaluate Pabón; (d) the grant of post-trial discovery of all documents related to the 2019 competency evaluation; and (e) an evidentiary hearing to assess the evidence.

The defendants appealed from the judge's February 2020 denial in May 2020.  José withdrew his May 2020 appeal, however.

---

[27] A quick housekeeping matter.  The government also argues that "[b]ecause no defendant filed a timely appeal of the Indicative Ruling" below, the law-of-the-case doctrine bars each of them from now appealing their subsequent challenges to that ruling.  But given the other bases we identify for ruling in the government's favor (which we announce shortly), we consider the argument moot and so express no opinion on the subject.

So his challenges to that denial are not before us (but even if they were, they would wash out for the same reasons his codefendants' challenges do — as we are about to show).[28]

Aurea and Marcia claim that their appeals are timely because (they write) nothing in Criminal Rule 37 or Appellate Rule 12.1 "requires that an additional notice of appeal be filed within [] 14 days of the denial of a request for an indicative ruling" (their belief is that they did not have to file any other notices of appeal beyond their original (and timely) 2019 notices of appeal from the criminal trial). But caselaw says that an additional appeal *is* required when a judge denies a motion pursuant to Criminal Rule 37. See Rivera-Carrasquillo, 933 F.3d at 50-52, 52 n.19 (affirming the denial of appellants' Criminal Rule 33 motion — filed through the indicative-ruling process — where the government "agree[d] with [appellants]" that they had filed timely notices of appeal from that denial); see also United States v. Graciani, 61 F.3d 70, 77 (1st Cir. 1995) (noting that "[i]f the district court denies the [Criminal Rule 33] motion" filed during the pendency of the direct appeal, "the defendant may take a

---

[28] Our December 2021 order did say that the "[t]he merits panel w[ould] decide whether to consider the post-conviction orders contained in [José's] supplemental addendum, which post-date defendant's direct appeal." But José does not suggest that that order entitles him to appellate review of the judge's February 2020 decision. See Zannino, 895 F.2d at 17.

further appeal"); United States v. Fuentes-Lozano, 580 F.2d 724, 725-26 (5th Cir. 1978) (per curiam) (explaining that "[i]f upon hearing the [Criminal Rule 33] motion, the trial court is inclined to deny it, the court may do so; a separate appeal may then be taken from the denial of the motion and consolidated with the pending appeal"). See generally Jackson v. AT&T Ret. Sav. Plan, No. 21-30052, 2021 WL 2177674, at *1 (5th Cir. Mar. 31, 2021) (per curiam) (dismissing a civil appeal from the denial of an "indicative ruling" on a Fed. R. Civ. P. 60(b) motion where the plaintiff's notice of appeal was untimely); Jordan v. Bowen, 808 F.2d 733, 736-37 (10th Cir. 1987) (holding that the denial of an "indicative ruling" on a Fed. R. Civ. P. Rule 60(b) motion filed while an appeal was pending was not before the court of appeals where "no appeal was taken" of that denial).[29] A party is only required to "promptly notify the circuit clerk" under Appellate Rule 12.1 if the district court says that it would *grant* the underlying motion or that the motion raises a substantial issue.

---

[29] Fed. R. Civ. P. 62.1 is the civil counterpart to Criminal Rule 37. These rules have the same text. And Criminal Rule 37 explicitly "adopts . . . the practice that most courts follow when a party makes a motion under [Civil] Rule 60(b) . . . to vacate a judgment that is pending on appeal." Fed. R. Crim. P. 37 advisory committee's notes to 2011 amendment. We had already adopted Civil Rule 60(b)'s framework in the context of Criminal Rule 33 motions long before Criminal Rule 37 came on the scene. See Graciani, 61 F.3d at 77-78.

See Fed. R. Crim. P. 37(b); Fed. R. App. P. 12.1; see also United States v. Maldonado-Rios, 790 F.3d 62, 64-65 (1st Cir. 2015); United States v. Cardoza, 790 F.3d 247, 248-49 (1st Cir. 2015); Graciani, 61 F.3d at 77 (citing United States v. Frame, 454 F.2d 1136, 1138 (9th Cir. 1972) (per curiam) (stating that "[o]nly after the district court has heard the [Criminal Rule 33] motion and decided to *grant* it is it necessary to request a remand from the appellate court")).[30]  So Aurea and Marcia had to — but did *not* — comply with Appellate Rule 4(b)(1).  See United States v. Reyes-Santiago, 804 F.3d 453, 459 (1st Cir. 2015) (noting that "[i]n a criminal case, a defendant's notice of appeal must be filed in the district court within 14 days after the later of:  (i) the entry of either the judgment or the order being appealed; or (ii) the filing of the government's notice of appeal," and adding that "the time limits in [Appellate] Rule 4(b), 'even if not

---

[30] Citing Walsh v. Wellfleet Commc'ns, No. 20-16385, 2021 WL 4796537, at *3 (9th Cir. Oct. 14, 2021), Marcia argues that another notice of appeal is not needed because an "indicative ruling [is] not an appealable final order."  But even assuming one could read the judge's decision only as a refusal to *consider* their underlying motions (or as an *indication* that he would deny them if he had jurisdiction), we do not see how that helps the defendants.  After all, the Walsh court held that it "lacked jurisdiction" to review an "indicative ruling [that] was not an appealable final order."  See id.  And Marcia says that our jurisdiction rests on 28 U.S.C. § 1291 — a statute that gives us "jurisdiction over appeals from *final* decisions and orders of the district courts within this circuit."  See Royal Siam Corp. v. Chertoff, 484 F.3d 139, 142 (1st Cir. 2007) (emphasis added).

- 73 -

jurisdictional, are mandatory when raised by the government'" (quoting United States v. Gonzalez-Rodriguez, 777 F.3d 37, 40 n.4 (1st Cir. 2015))). Cf. Eberhart v. United States, 546 U.S. 12, 17 (2005) (confirming that certain "untimely notices of appeal [that] sprang from 'excusable neglect'" had to be "dismiss[ed] on the basis of untimeliness . . . because district courts must observe the clear limits of the Rules of Criminal Procedure when they are properly invoked" (quoting United States v. Robinson, 361 U.S. 220, 222 (1960))).

Aurea and Marcia next argue that their May 2020 appeals are timely because we never surrendered jurisdiction over their direct appeals from their criminal trial and because they complied with our October 2019 order denying their remand request "without prejudice to [their] following the procedures set forth in [Criminal Rule] 37 and [Appellate Rule] 12.1." But they cite no supporting authority for these never-surrendered-jurisdiction arguments. See Zannino, 895 F.2d at 17.

Aurea also tries to get mileage from our (a) December 2019 order staying the defendants' direct appeals from their criminal trial and ordering them to "file status reports every thirty days advising this court of the status of the pending district court motions for indicative rulings"; (b) March 2020 order continuing "the stay of [those direct] appeals" and requiring

the defendants to file "status reports every thirty days advising this court of the status of the district court proceedings related to defendants' motions for indicative rulings"; and (c) June 2020 order lifting the stay of the appellate proceedings because the events related to the motions for indicative rulings in the district court had concluded. But *none* of these orders purport either to excuse the defendants from appealing from the denial of their motions for post-trial relief or to (as Marcia seems to suggest) toll the time they could take a timely appeal from them (also the June 2020 order Aurea cites came *after* their May 2020 appeals).[31] And — on top of that problem — they cite no authority supporting their views. See Zannino, 895 F.2d at 17.

Aurea and Marcia reckon that their May 2020 appeals are timely because we "accepted" their notices and "consolidated" them with their direct appeals from their criminal trial. But they again offer no supporting authority for that idea. See id.

Marcia contends that her May 2020 appeal is timely because Appellate Rule 4(a)(1)(B)'s 60-day window to appeal applied and because she filed that appeal soon after the judge

---

[31] To the extent the defendants think that our July 2021 order directing them to "place all of their appellate arguments and requests for relief in their opening briefs" makes a difference, they would be wrong — because that order came *after* the May 2020 appeals as well.

"accepted and entertained" her motion for reconsideration. But as already noted, Appellate Rule 4(a)(1)(B) refers to *civil* appeals and so does not apply here. As for her reconsideration-based argument, the judge deemed her reconsideration motion "extremely overdue," having been filed "twenty days" late. And "an *untimely* motion for reconsideration . . . [is] a nullity and [will] not toll the time in which to appeal even though the court considered and denied the motion on its merits." Feinstein v. Moses, 951 F.2d 16, 18 (1st Cir. 1991) (first and second alterations in original) (emphasis added) (quoting Flint v. Howard, 464 F.2d 1084, 1086 (1st Cir. 1972)).

Marcia argues as well that the government waived the timeliness challenge by waiting until its opening brief to make it. But she provides no authority *requiring* the government to object to the untimeliness of an appeal — an issue solely within a court of appeals's purview — before it files its opening brief. Maybe that is because other courts have held the opposite of what she argues. See, e.g., United States v. Singletary, 471 F.3d 193, 196 (D.C. Cir. 2006); United States v. Sadler, 480 F.3d 932, 940-41 (9th Cir. 2007); United States v. Garduño, 506 F.3d 1287, 1292 (10th Cir. 2007); United States v. Sealed Appellant, 304 F. App'x 282, 284 (5th Cir. 2008); United States v. Lopez, 562 F.3d 1309, 1313 (11th Cir. 2009). And while the government may waive such an

objection by not making the objection in its opening brief, see Reyes-Santiago, 804 F.3d at 459-60, no such problem occurred here.

Aurea and Marcia also assert that we should "exercise [our] discretion" and review their challenges to the denial of their motions under Appellate Rule 4(b)(4)'s "excusable neglect standard." But they make no developed argument that we have that kind of discretion when the government properly invokes the *mandatory* claims-processing rule of Appellate Rule 4(b)(1). Marcia does cite United States v. Randall, 666 F.3d 1238 (11th Cir. 2011), where an appellate court exercised discretion to consider an untimely appeal. But there — unlike here — the government did *not* invoke the "inflexible claim-processing rule" (Randall involved an application for a certificate of appealability, which per that circuit's rules meant the government could not file a response brief unless the court of appeals okayed it). See id. at 1241.

The defendants also touch on some of these or similar claims as part of their direct appeals from their criminal trial.

For example, the defendants argue that the judge abused his discretion at the 2018 trial by not appointing an independent psychiatrist to see if Pabón could testify competently. They also fault the judge for concluding in his 2020 indicative ruling that Pabón's behavior in the decade after the 2008 plea hearing did not

spark suspicions about his competency in 2018 — a glaring error (the argument continues) because BOP medical records show him diagnosed as schizophrenic five months after that hearing. But no defendant cites any record evidence showing that the defense contested Pabón's competency before or during the 2018 trial. And no defendant argues that these challenges survive plain-error analysis. See Rivera-Carrasquillo, 933 F.3d at 49 n.15. The defendants could be seen as suggesting that the judge had an *independent* duty to investigate Pabón's competency to testify in 2018. That suggestion is possible given claims (like those in José's brief) that the judge (a) knew before the trial that Pabón had undergone psychiatric treatment a decade earlier (information that emerged from the 2008 plea hearing); (b) heard on the eve of trial that Pabón had "excited[ly]" told prosecutors that he planned on breaking the plea agreement and would not cooperate any further; and (c) saw at trial that Pabón had testified "vague[ly], bizarre[ly], contradictor[ily] and unresponsive[ly]." But they do not substantiate any independent-duty suggestion with supporting authority. See Zannino, 895 F.2d at 17.

Aurea somewhat relatedly argues that the judge erred by "hastily determin[ing Pabón] was competent to plead [guilty in 2008] without any further inquiry of mental conditions or even asking what medication he was taking." But she develops no

argument that she can contest a judge's finding that another person could competently plead guilty in a proceeding that pre-dates her trial by ten years (*i.e.*, that she has "standing" to make that claim, if you will).  See id.

Marcia and José also make Brady/Giglio claims as part of their direct appeals from their criminal trial.  According to them,

> [t]he issue of intentional conduct by the government in refusing to produce the medical records of [Pabón] and the government's intentional conduct to hide the Giglio impeachment material occurred shortly before and during trial and as such, both issues of misconduct are part of the original appeal as they relate directly to the original judgment in that case.

José also contends that the issue of "the prosecution's intentional misconduct" is properly before us because the defendants raised it in their September 2019 remand motion.  And Marcia argues that our considering her Brady/Giglio claims would not "surprise" the government because she hyped them in the same joint remand motion José mentioned and because the general "issue of the prosecutors' misconduct was raised at the [d]istrict [c]ourt before sentencing," even though the Brady/Giglio arguments "w[ere] not specifically raised [in] the [d]istrict [c]ourt before sentencing."  But they did not preserve their Brady/Giglio challenges in their direct appeals from their criminal trial,

- 79 -

because the September 2019 remand motion that they spotlight came *after* their direct appeals from their criminal trial.

Aurea develops no argument that her Giglio claim is part of her direct appeal from her criminal trial. See Zannino, 895 F.2d at 17. She also admits that she received the medical records at the center of Marcia and José's Brady claim. And she does not dispute that those same medical records included Pabón's 2008 diagnosis of schizophrenia. Instead she insists that those records *also* show that before "trial [Pabón] was evaluated at his own request and diagnosed as not having a mental defect" and "the entry in said records is to the effect that [he] has no history of a mental condition." Pivoting off that claim, she argues that the "[medical] records with a false diagnoses [*sic*] unfairly prejudiced [her] defense . . . and deprived her of a fair trial and due process rights." But she did not preserve this theory through her direct appeal from her criminal trial. So we can review it at most (if at all) for plain error. And because she does not try to address the plain-error test, she waived it. See Rivera-Carrasquillo, 933 F.3d at 49 n.15.

## 2
### Second Group

With that (and at long last) we switch to Aurea's and Marcia's challenges involving Pabón's 2020 competency evaluation and his 2020 letter to his counsel and the judge — challenges that

- 80 -

attack the judge's denials of their motions for indicative rulings to permit post-trial discovery based on that evaluation (which changed Pabón's diagnosis from schizophrenia to antisocial personality disorder), appoint an independent psychiatrist to examine Pabón, and hold an evidentiary hearing based on both the evaluation and the letter. The appeals raising these issues are docketed separately from the direct appeals from the criminal trial.[32]

What sinks Aurea's and Marcia's claims, however, is that they failed to develop them. For example, they do not cite any authority explaining either how evidence of Pabón's then-present competence in *2020* to help his own defense shows he lacked competence to testify against them in *2018* or how they can force him to undergo an independent psychiatric evaluation. See Zannino, 895 F.2d at 17.

Aurea does say that her request for post-trial discovery is "predicated on due process rights integral to exercising the substantive right that [Fed. R. Crim. P. 33(a)] creates for 'a new

---

[32] José joined at least one of Marcia's and Aurea's motions below. But he did not appeal any of the judge's motion denials. So his challenges to Pabón's 2020 competency evaluation and his 2020 letter are not before us.

trial i[f] the interest of justice so requires.'"[33]  And quoting a district court case that in turn quotes a couple Supreme Court opinions, she insists that "[e]ven though defendants do not have a 'free[-]standing right' to post[-]conviction discovery in this specific case[,] the possible avenues of discovery are 'fundamentally inadequate to vindicate the substantive rights provided' by [Criminal] Rule 33(a)."  But the Supreme Court has described any such right as a limited one.  See Dist. Att'y's Off. For Third Jud. Dist. v. Osborne, 557 U.S. 52, 67-69 (2009) (explaining that a convicted defendant's "right to due process is not parallel to a trial right, but rather must be analyzed in light of the fact that he has already been found guilty at a fair trial, and has only a limited interest in postconviction relief"); see also Tevlin v. Spencer, 621 F.3d 59, 69-70 (1st Cir. 2010) (same).  And she develops no argument that she has a due-process right to post-trial discovery in her circumstances.  See Zannino, 895 F.2d at 17.

### 3
### Third Group

We end then with the defendants' challenges involving Pabón's 2021 competency evaluation — challenges that call their

---

[33] Criminal Rule 33(a) says that "[u]pon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires."

judgments of convictions into question because of the light that evaluation supposedly casts on Pabón's mental state before and during their trial.

But hurting the defendants here is that the 2021 competency evaluation is *not* part of the record in their direct appeals from their criminal trial. True (as they note) they briefed this challenge following our July 2021 order that — after refusing to direct the judge to appoint an independent psychiatrist and hold an evidentiary hearing — told them to "place all of their appellate arguments and request for relief in their opening briefs." But that order simply said that they should brief whatever "arguments" they wished to in their pending appeals from their criminal trial — it never said that they could make the 2021 competency evaluation part of the appellate record in those appeals. See generally Mount Vernon Fire Ins. Co. v. VisionAid, Inc., 875 F.3d 716, 726 n.10 (1st Cir. 2017) (holding that an order from us granting a party's request for supplemental briefing did not imply that "we would ignore longstanding" rules of appellate practice).

The defendants also imply that if the 2021 competency evaluation does not (on its own) call their judgments of convictions into question, it does provide grounds for the selection of an independent psychiatrist to assess Pabón. To their

way of thinking, the 2021 competency evaluation "contradict[ed] earlier BOP evaluations; "declare[d]" Pabón "competent, but by neatly avoiding conducting relevant testing to make such a determination"; and did not "address the fundamental question of whether [he] was delusional in 2018 and whether he can be restored to competency . . . with medical evidence."  Aurea adds that she should get post-trial discovery of the materials behind the 2021 competency evaluation.  And José adds that he should also get a hearing based on the 2021 competency evaluation.  But the predicate for these claims remains the 2021 competency evaluation — which again is not in the record in their direct appeals from their criminal trial, which also makes these claims hopeless.

## IX
## Wrap Up

Having considered and rejected all of the defendants' many arguments, we ***affirm***.[34]

---

[34] We reject the defendants' request that we find reversible cumulative error from any combination of the errors they alleged above.  That is because the aggregate effect of the instances where we invoked harmless error "do not come close to achieving the critical mass necessary to cast a shadow upon the integrity of the verdict."  See United States v. Sepulveda, 15 F.3d 1161, 1196 (1st Cir. 1993).  And to the extent the defendants think that one could pull other arguments from their briefs, we would consider those arguments waived.  See Rodríguez, 659 F.3d at 175-76.

One last bit of housekeeping.  Aurea moved after oral argument to join certain issues pressed in Marcia's reply brief.  Whatever else may be said of Aurea's effort, all we need say is that we

**-Concurring and Dissenting Opinion Follows-**

deny her motion as "moot" because none of Marcia's reply-brief arguments moves the needle off our affirmance conclusion.  <u>See</u> <u>United States</u> v. <u>Bennett</u>, 75 F.3d 40, 49 (1st Cir. 1996).

**LIPEZ**, <u>Circuit Judge</u>, **concurring in part and dissenting in part.** Although I agree with my colleagues that most of appellants' claims of error fail, I strongly disagree that the district court judge permissibly advised the jury, via judicial notice, that he had found in 2008 that Alex Pabón Colon ("Pabón") was competent to plead guilty. The majority finds no abuse of discretion in the court's decision to give that notice because "the judge carefully limited the notice to Pabón's <u>plea competency in 2008</u>" and "said nothing about Pabón's <u>trial credibility</u> in <u>2018</u>." As I explain below, that rationale fails to withstand scrutiny, and the record indicates that the court's error caused serious prejudice to two of the appellants: Marcia Vázquez Rijos ("Marcia")[35] and José Ferrer Sosa ("Ferrer"). Accordingly, Marcia's and Ferrer's convictions and sentences should be vacated.

## I. Background

After Pabón provided the testimony that, in the majority's words, "devastated the defendants' innocence theory," defense counsel cross-examined him for roughly eight hours. The cross-examination was wide-ranging, with the defendants seeking to paint Pabón as someone who regularly bragged, exaggerated, and

---

[35] Like the majority, I refer to Marcia Vázquez Rijos and her sister, Aurea Vázquez Rijos, by their first names to avoid confusion.

lied. Their effort to undermine his credibility included questioning about statements he made in grand jury testimony in 2008 and during FBI interviews, both of which included descriptions of the events surrounding Adam Anhang's death that differed from the account he had just given in his direct examination at trial. The defendants also implied that Pabón could not be trusted because of the deals he had made with the government.

A central part of the defense strategy in attacking Pabón's credibility was to suggest that he was mentally unbalanced and thus an unreliable witness about the details of the murder. Among other inquiries, defense counsel asked him about a series of letters that he had written both before and during his incarceration in which he used various ink colors and added stamps to the pages as decorations. Many of the letters appeared to converse with celebrity figures with whom Pabón did not have a relationship. Pabón explained that he enjoyed writing to different people and that he saw his letters as "gifts" to the recipient and "art that comes from the heart." Throughout the cross-examination, Pabón rambled and, at times, provided answers that were not directly responsive to the questions asked of him. He often gave answers containing irrelevant information and had to be reminded by the trial judge to answer the question asked of him.

Aurea's attorney was the only defense counsel who explicitly asked Pabón about his mental health. When introducing Pabón's plea agreement into evidence, she asked Pabón about the terms of that agreement and focused on the lower sentence he expected to receive. The questioning included the following:

> Q: At that time, before this judge, were you asked as to your health; mental health?
>
> A: Yes, they did, I think. I believe that I remember that they asked me something.
>
> Q: Okay. And you stated to the Court here that you, at that time, had been with a psychiatrist because you had depression, correct?
>
> A: I think something like that. I think I did, yes.

Aurea's attorney also inquired into Pabón's mental health while he was in prison, including whether he took specific medications during his incarceration. Counsel also asked if he had requested a psychological evaluation in 2018 "to prove that you were not crazy."[36]

---

[36] Pabón denied that he requested the evaluation and said "[i]t was the psychologist who came to me." The brief exchange concluded as follows:

> Q: So you never told her that you needed to prove that you were not crazy?
>
> A: She knows it since the beginning, and many people there know so.

When Pabón's testimony was complete, the government asked the court to take judicial notice of the fact that Pabón had been found competent to plead guilty in 2008. All three defendants objected, raising concerns about the impact of the requested judicial notice on the jury's factfinding. After extensive colloquy, the court decided to give the disputed notice, acquiescing, in effect, to the government's argument that the court needed "to put the jury in perspective" about Pabón's mental health when he entered his guilty plea in 2008. In explaining his decision, the judge stated that he "ha[d] to balance the equities here." Ferrer's attorney then argued, to no avail, that "[taking judicial notice of this fact] isn't fair because . . . as an attorney, I am competing with the Court, because the Court said he was competent."

## II. Competency vs. Credibility

As I have described, the defense launched an all-out attack on Pabón's credibility that included questions designed to show that he had been mentally unstable for a long time and that, consequently, the jury should distrust his testimony about the details of Anhang's murder. The government plainly was concerned that the defendants' aggressive cross-examination of Pabón might have raised doubts among the jurors about the reliability of his testimony. The government understandably wanted to counter the

negative depiction of its star witness and restore his credibility. It could have attempted to do so in the redirect questioning it conducted by focusing on Pabón's ability to understand and accurately report on the events in which he was involved, including his decision to admit that he killed Anhang. The government instead asked the court to offset the damage from the cross-examination on Pabón's mental health by "complet[ing] the picture" with the challenged judicial notice.

My colleagues reject appellants' contention that the judicial notice improperly intruded into the jury's role as factfinder on Pabón's credibility. Emphasizing the distinction in the law between competency -- an issue for the court -- and credibility -- an issue for the jury, the majority seems to suggest that appellants have no basis for objecting to the court's accurate statement that it found Pabón competent to plead guilty in 2008. And the majority further emphasizes that appellants' challenge to the judicial notice falls flat because they failed to ask for an instruction explaining the difference between competency and credibility.

To the extent the majority is relying on appellants' failure to request an explanatory instruction in finding no abuse of the district court's discretion, their reasoning falls short. Appellants made eminently clear that the judicial notice was

problematic because, regardless of the actual difference between the two concepts, the jury was likely to understand the court's statement on Pabón's competence as commentary on his credibility. In the district court, Marcia's attorney explicitly raised a concern about jury confusion, contrasting the legal and factual issues concerning Pabón's capacity:

> [W]e believe the instruction will confuse the jury because the competence that is discussed in the context of a change of plea hearing is a legal term. It is not necessarily a matter related to facts. It is a legal term very specific to this. And I don't believe that the jury will be able to distinguish between the both, Your Honor. It is too much of a risk to do so.

On appeal, Ferrer notes the defense objection at trial "that the district court's instruction would cause confusion on the jury." He asserts that the prejudice from the judicial notice "is compounded by the fact that the district court did not explain to the jury what it meant to be found competent to plead guilty" and that, consequently, "the district court placed its imprimatur on [Pabón]'s credibility." In my view, these arguments clearly express appellants' concern that the judicial notice would (and did) compromise the jury's factfinding on Pabón's credibility and, for that reason, was improper.

Moreover, the majority's treatment of the merits -- particularly their focus on the legal distinction between

competency and credibility -- seriously misses the mark.  As the majority acknowledges, there was no challenge to Pabón's capacity to be a witness at trial and therefore his "competency" in the sense of an individual's ability to understand the legal proceedings in which he was involved was never relevant in this case.  The question for the jury at trial was whether Pabón was a reliable, believable witness.  Defense counsel heavily emphasized Pabón's bizarre behavior and mental health treatment over many years as one factor, among others, for discrediting his testimony.  In other words, the defense challenged Pabón's "competency" only in the sense that nonlawyers would understand that concept, suggesting that Pabón's testimony about the murder was unreliable because of his long history of mental illness.

The defense reliance on this understanding of competency is apparent in the concern expressed by Ferrer's attorney at trial, and echoed on appeal, that the proposed instruction would place "the imprimatur of the Court upon the issue, which is an issue of fact."  Although defense counsel used the term "competence" throughout the colloquy on the government's request for judicial notice -- a potentially confusing way to make their point -- it was obvious that they were opposing the court's interference with the jury's factfinding and, hence, were necessarily referring to the jury's credibility determination.

Yet, despite defense counsel's making it clear that the defendants were not challenging Pabón's competency to testify or otherwise engage in legal proceedings, the government insisted that the judicial notice was needed to rebut such a challenge. And, in seeking the court's intervention on that basis, the prosecutor incorrectly characterized the defense argument as unusual: "They are making the issue of his competency. . . . Normally that part goes without saying, but because it is an issue in this case brought by the Defense, the jury is entitled to have the whole package."

The "package" the court could properly give to the jury, however, did not include Pabón's competency to enter the guilty plea. In the context of the defense strategy, the district court's judicial notice that it had found "Alex El Loco" competent at that time -- despite his apparently longstanding mental illness and bizarre past behaviors -- spoke directly to the jury on Pabón's credibility. That intervention by the court created the unacceptable risk that the jurors understood the judicial notice of the competency finding to reflect the trial judge's view that Pabón's mental illness did not make him untrustworthy -- regardless of the jury's perception of his performance on the witness stand. It thus does not matter that the instruction specifically referred to a time well before the 2018 trial. By instructing the jury on

its finding of Pabón's competence in 2008, the judge was inescapably telling the jury that its finding was relevant to the jury's evaluation of Pabón's credibility at trial.

That very concern was voiced by Marcia's counsel: "What they want from the Court is to create an effect and . . . to influence the jury that [Pabón] is of a state of mind different to that that was presented to them through the presentation of evidence, cross-examination and direct examination." Indeed, with Pabón's "legal" competency to testify not at issue, the jury had no basis for understanding the judicial notice as other than a veiled commentary on his credibility. And that, of course, was precisely what the government was hoping to accomplish with its request for judicial notice.

To be clear, I am not saying that evidence of Pabón's mental capacity, as a rebuttal to the defense's attack on his credibility, was impermissible. Rather, the problem is that the court itself informed the jury that it had found Pabón competent -- highlighting and thereby elevating the importance of that fact -- when the government should have borne full responsibility for rehabilitating the credibility of its key witness and persuading the jury of appellants' guilt beyond a reasonable doubt. The court thus plainly abused its discretion when it chose to "balance the equities" by giving the requested judicial notice instead of

leaving the burden on the government -- where it belonged -- to "complete the picture" on Pabón's mental health.

The trial court's intervention on the issue of Pabón's credibility is no small matter.  We have oft noted the impact that a court's words may have on jurors.  See, e.g., United States v. Moffett, 53 F.4th 679, 685 (1st Cir. 2022) (observing that "'the influence of the trial judge on the jury is necessarily and properly of great weight' and [the] trial judge's 'lightest word or intimation is received with deference'" (quoting Starr v. United States, 153 U.S. 614, 626 (1894))); United States v. Márquez-Pérez, 835 F.3d 153, 158 (1st Cir. 2016) (noting that judges "should be most cautious in front of the jury, which may be vulnerable to judges' 'lightest word or intimation'" (quoting United States v. Ayala-Vazquez, 751 F.3d 1, 28 (1st Cir. 2014))).  That influence is particularly sensitive in the realm of credibility.  When judges "exercise their power to actively involve themselves at trial, they must remain constantly vigilant to ensure they do not infringe upon the province of the jury by commenting or appearing to comment (positively or negatively) on a witness's credibility."  Ayala-Vazquez, 751 F.3d at 28 (emphasis added); see also United States v. Starks, 861 F.3d 306, 310 (1st Cir. 2017) (noting the impropriety of "judicial statements adding information to the record that bears on a witness's credibility").

- 95 -

Unsurprisingly, judicial statements touching on credibility are especially problematic when they bear on the testimony of a critical witness. In United States v. Raymundí-Hernández, we explained that "[w]here the Government builds its case against criminal defendants predominantly on cooperating witness testimony, . . . 'the [district] court must take particular care to avoid any appearances that it favors the government's view of the case.'" 984 F.3d 127, 152 (1st Cir. 2020) (per curiam) (second alteration in original) (quoting United States v. Rivera-Rodríguez, 761 F.3d 105, 120 (1st Cir. 2014)). We found that the trial court "cause[d] serious prejudice" in Raymundí-Hernández when commenting that a defense witness's testimony, which was designed to undermine the credibility of a cooperating witness, was "not relevant in this case." Id. at 152-53.

In the circumstances here, the bland instruction that "the jurors remain[] the sole deciders of witness credibility" does not suffice to cure the harm from the court's decision to -- in effect -- "complete the picture" on Pabón's believability as a witness. As we stated in Raymundí-Hernández, "where the reliability of witness testimony is so strongly implicated (here, that of the cooperating witnesses against that of the defense witnesses), 'such interference with jury fact-finding cannot be cured by standard jury instructions.'" 984 F.3d at 153-54 (quoting

United States v. Tilghman, 134 F.3d 414, 421 (D.C. Cir. 1998)).[37] Indeed, telling the jurors that they remain the decisionmakers on credibility allows them to use whatever evidence they heard -- including the court's judicial notice -- in making their judgment.

The majority makes much of the fact that both the government and the defense treated Pabón's credibility as a live issue in addressing the jury during closing arguments. It is certainly no surprise that the lawyers argued that point. The problem with the judicial notice in this case is not that the district court entirely preempted the jury's factfinding on Pabón's credibility, but that it weighed in on the government's behalf. Given the judicial notice, the burden on the defendants to create doubt about Pabón's credibility was greater than it should have been, and the defense's arguing "with gusto" -- in the majority's words -- was simply counsel doing their job. Nor did the government's arguments in any way offset the impact of the court's intervention. The predictable and traditional credibility arguments in closing plainly provide no support for the majority's view that the court's ill-advised intrusion into the jury's factfinding was appropriate.

_____

[37] Although Raymundí-Hernández does not involve a judicial-notice challenge -- as the majority points out -- the underlying concern expressed there about interference in the jury's factfinding on witness credibility is equally apt in this context.

In sum, in acceding to the government's request that the court inform the jurors through judicial notice that it determined that Pabón was competent when he entered his guilty plea in 2008, the court assisted the prosecution on arguably the most important issue in the case for the defense: Pabón's credibility. The judge's explanation for doing so -- that he "ha[d] to balance the equities" in the aftermath of Pabón's cross-examination -- reflects a fundamental misunderstanding of the court's role. It was for the government, not the judge, to undo any damage to Pabón's credibility caused by the defense's attack on Pabón's mental stability. The court's intrusion into the jury's factfinding -- by adding its "great weight" to the prosecution's case, Starr, 153 U.S. at 626 -- was a palpable abuse of discretion.

### III. The Question of Prejudice

The district court's error inescapably had the effect of bolstering the testimony of Pabón to the detriment of the defendants. The remaining question is whether the error was sufficiently prejudicial that appellants are entitled to a new trial. We have noted some uncertainty in our caselaw about the applicable standard of harmless error when the trial judge has, in effect, "commented on the credibility" of a key witness and "put additional facts before the jury that bore on the witness['s] credibility." Starks, 861 F.3d at 310 & n.1. Although Aurea

argues that the court's error is constitutional in nature, requiring the government to prove that it was "harmless beyond a reasonable doubt," see, e.g., Moffett, 53 F.4th at 691, the circumstances here are equivalent to the sort of improper judicial intervention that our court repeatedly has assessed under a "serious prejudice" standard -- i.e., asking whether "there is a reasonable probability that, but for the error, the verdict would have been different," Rivera-Rodríguez, 761 F.3d at 112; see also, e.g., Raymundí-Hernández, 984 F.3d at 152-53. I therefore use the "serious prejudice" standard in reviewing the evidence against each appellant.[38]

Hence, to determine harmlessness, it is necessary to ask whether it is "reasonably probable" that the jury would have reached the same verdict for each defendant if the court had not informed the jurors that Pabón was deemed competent at the time of

---

[38] In Moffett, the error at issue involved a verdict form and related instructions that "invaded the jury's power over factfinding by over-emphasizing certain of the government's evidence in a manner that was contrary to [the defendant]'s interests." 53 F.4th at 686. We considered the error "of a 'constitutional dimension'" and used the beyond-a-reasonable-doubt formulation of harmless error. Id. at 691 (quoting United States v. Rivera-Santiago, 107 F.3d 960, 967 (1st Cir. 1997) (per curiam)). Here, as I have explained, the court's error likely influenced the jury's assessment of Pabón's credibility, but I cannot say that it "'usurped the jury's factfinding role'" on that issue or on appellants' guilt. Id. at 686 (emphasis added) (quoting Rivera-Santiago, 107 F.3d at 965).

his plea -- a fact that the jurors reasonably could have understood as an implicit observation on the credibility of Pabón's testimony at trial.  Put differently, did the guilty verdicts likely depend on the credibility of Pabón, whose veracity was improperly enhanced by the judicial notice?

Pabón was the critical witness at trial.  As the majority recounts, he testified that the three appellants planned the crime and hired him to carry it out.  Given Pabón's importance to the government's case, assessing the likely impact of the court's improper boosting of his credibility requires determining whether sufficient evidence other than Pabón's testimony supported the jury's findings of guilt for each of the threesome.

## A. Aurea Vázquez Rijos

The government's case against Aurea included evidence showing a strong motive, planning steps, and efforts to impede law enforcement's investigation of the crime.  The record before the jury included Aurea and Anhang's prenuptial agreement, which provided Aurea with a substantial inheritance if Anhang died and much less if the couple divorced. Witness testimony revealed that Aurea and Anhang's marriage was turbulent, that Anhang came to believe the prenuptial agreement gave too much to Aurea, and that Anhang was seeking a divorce within weeks of the wedding.  The government's theory that Aurea wanted to kill her husband and avoid

a divorce was supported by witness accounts of comments she had made, including that she would be "better off" if her husband died than if he were alive.

The evidence that Aurea planned the murder included testimony from two witnesses who said she had asked them if they knew a "hit man," a question one of them understood to mean she was looking to hire one. The government also offered testimony that Aurea had called Anhang's office repeatedly during the afternoon preceding his evening murder to confirm the couple's dinner plans, permitting an inference that her "insistent calls" were made to ensure that they would be in Old San Juan at the time she had arranged for the attack.

Aurea's behavior after Anhang's death also was suspicious and seemingly designed to impede and evade law enforcement's attempts to investigate the murder and prosecute the case. One agent testified that Aurea gave him an incorrect description of the perpetrator, including clothing details that did not match those given by other eyewitnesses. She failed to appear at the prosecutor's office in response to a summons, and law enforcement's multiple efforts to arrange an interview with her were unsuccessful. The evidence revealed that Aurea moved to Italy soon after the murder, which the government characterized as "flight." Aurea also sought the assistance of a criminal defense

attorney in Israel, explaining to him that she wanted to move to Israel but wanted to know if she would be protected there "[i]f there was ever an order of extradition [from the United States] with the death sentence."

In sum, while Pabón's testimony that Aurea hired him to kill her husband reinforced the prosecution's narrative, there was ample and compelling evidence from sources other than Pabón to support a finding that Aurea was motivated to kill Anhang and developed a plan to get the deed done. I thus cannot conclude that it is "reasonably probable" that, absent the district court's error, the jury would have acquitted Aurea.

## B. Marcia Vázquez Rijos

By contrast with the evidence from multiple sources suggesting Aurea's guilt, the government's evidence against Marcia -- other than Pabón's testimony -- was far from compelling. The sinister connotation of the evidence against her depended heavily on Pabón's testimony that she had conspired with the others to murder Anhang. Indeed, the majority's analysis of Marcia's sufficiency challenge relies almost entirely on Pabón's testimony.

The thinness of the case against Marcia is apparent from a review of the other evidence offered by the government. The government easily proved the uncontroverted fact that Marcia knew Pabón and had done business with him before the murder. An

employee at the Pink Skirt, a restaurant that Anhang had purchased for Aurea, testified that she sometimes saw Marcia with Pabón there. A friend of Pabón's, Derick Osterman Kim, testified that Marcia on occasion bought marijuana from Pabón. This evidence of her prior relationship with Pabón obviously provides no support for a finding that Marcia was involved in a conspiracy to pay Pabón to murder Anhang.

Nor is the evidence of Marcia's conduct following Anhang's death sufficient. Most suggestively, a friend of Pabón's, Isadoro Perez-Muñoz, testified about letters Pabón asked him to deliver to the Pink Skirt on three separate occasions. The first letter was intended for Aurea, but she was not at the Pink Skirt when Perez-Muñoz arrived to deliver it. Perez-Muñoz brought the letter back to Pabón, who directed him to deliver the letter to Marcia the next day. Marcia read the letter and gave Perez-Muñoz a message for Pabón: her sister was sick and depressed, she had no money because Anhang's father had cancelled her accounts, the family was in crisis, and "the business was going bad." Perez-Muñoz delivered the second letter to Marcia, at Pabón's direction. After reading the letter, Marcia instructed Perez-Muñoz to tell Pabón that she had "already told [him] the situation and nothing can be done." She then went on to say "no to the money," Aurea "is still with the depression," "the business isn't going well and

. . . we are in a crisis; the accounts are frozen."  The third time, when Perez-Muñoz went to the Pink Skirt with two letters, neither Aurea nor Marcia was there, but he encountered the women's brother, Charbel, and Ferrer.  Both men refused to take the correspondence, which Perez-Muñoz took home and later read.  One letter, which was read to the jury, was addressed to "Marcial," but it includes a closing addressed to both "Audrea[39] or Marcial."  The four-page letter, dated March 3, 2006, stated in part:

> I don't want any excuses and I am truly counting on you to help me with this big favor. You denied me the $30,000 I asked you to lend me. . . . Well, now I need $200,000 in order to support myself and for expenses, debts, and other things I cannot tell you about.
>
> Marcial, with all due respect, I want you to talk to your sister and tell her that I need that money by March 12th or March 18th, 2006. . . . [Y]our sister has not shown up to court, and now, and the last time I heard from her, she was hiding and about to flee the country.  What is happening with you?  I need favors from you and you are hiding from me . . ..
>
> . . . I made it very clear to you, I have dealings with your husband Jose and your sister Audrea.  And tell both of them that I am asking this second favor and the second one is the last one.
>
> . . . After all this happened, you think that I am a dumb ass, but the truth is that I am not.  I am not afraid to face this case which

---

[39] Throughout the letter, Pabón refers to Marcia as "Marcial" and Aurea as "Audrea."

has become very ugly.  Things didn't turn out the way we thought they would, but only I did you a big favor.  I didn't know this person.  For you, he was a bump in the road which got in your way.

. . .

. . . [Y]our sister told [a friend of mine] . . . that she is not going to pay absolutely anything because you were not completely in agreement with the favor I did for you because it had caused you a lot of problems.  The truth is that I was not going to be the one to do the favor to her.  You became very anxious and you did not give me the correct coordinates, and it happened very quickly, and it was a little crazy, but I accomplished what she wanted.  Now, I need a favor from you.

. . .

. . . I don't give a damn if the victim's old man kept everything.  . . . I am making this clear; if you let me down, I will betray you also.  . . .

So, good fences make good neighbors.  Well, remember, all of us are very much involved in this.  So work with me and I will always be true to you.  . . . .

Now, send me the money that I am asking you and everything should continue as is.  Don't let me down. Hope it's clear. Okay. I will be waiting for the favor I asked you.  Audrea or Marcial, I will call you soon.

Although Pabón's demands and threats to Marcia in this letter are consistent with the government's narrative of her involvement in the murder conspiracy, that evidence is equally consistent with Marcia's knowing what happened but having played

- 105 -

no role in the planning.  Pabón's communications show only that, having initially failed to reach Aurea herself, Pabón began using Marcia as a go-between in his attempts to extract money from Aurea after the crime.  Even his assertion that "all of us are very much involved in this" indicates only that, months after Anhang's death, Marcia was "involved" in protecting her sister from prosecution.  It is Pabón's testimony concerning Marcia's involvement in the planning that turns the correspondence into damning evidence.  Moreover, to the extent Pabón's credibility was bolstered by the district court, that validation would extend to this communication.

The government also adduced evidence that Marcia was at Anhang's apartment the day after the murder.  One witness said she carried black garbage bags containing clothing out of the apartment, another said that Marcia took Anhang's cats away, and a third testified that Marcia emerged from Anhang's apartment with keys, two cell phones, a phone charger, and a CD.  But Marcia's appearance at Anhang's apartment is not probative evidence of her involvement in planning his murder.  Aurea was in the hospital at that time, and there is nothing facially inculpatory about Marcia's retrieving cats that needed to be cared for and other items from an apartment where her sister's husband had been living.

Adding to the ambiguous evidence is a series of emails between Marcia and Aurea indicating that Marcia helped her sister create fraudulent documents about her Jewish roots.[40]  Also among the emails between the sisters is a message from Marcia describing a conversation she had with their brother, Charbel:

> Charbel he is screwed with me because I will treat him like a stranger.  He deserves it. He is the pure devil.  He said -- and atrocity that I and Jose planned everything and that is -- he have this karma that it's my fault.  What a fucked up crazy.  . . . Don't you know that they are recording everything and everything you say they will believe it and we are going to get screwed by your fault . . ..

Again, this message can be construed consistently with the government's narrative that Marcia conspired with Aurea (along with Ferrer), but it is also easily understood to express Marcia's outrage that Charbel is accusing her and Ferrer of a crime they did not commit.  Indeed, if the message is read to refer to Anhang's murder, it would appear to exclude Aurea from involvement -- an implausible scenario.  It is more plausible that the message reflects Marcia's frustration about her brother's "crazy" accusation or refers only to Marcia's and Ferrer's post-crime assistance to Aurea.

---

[40]  The government produced evidence showing that Aurea attempted to obtain the protection of the Jewish community in Florence, Italy, by falsely holding herself out as Jewish.

One other email exchange between Marcia and Aurea warrants consideration. Marcia warned her sister to be careful of "a lot of enemies [who are] close who you owe for a long time," noted that Ferrer was in bad shape "economically and emotionally" -- referring to his family difficulties -- and said she did not want Ferrer to think that she had abandoned him and "that we used him." In her reply, Aurea says "I am really sorry that you feel like that . . .. I am more sorry that Jose feels that way too, but we are all in the same boat." The comment that the three of them are "in the same boat" obviously is consistent with the government's theory that all three defendants plotted and carried out the murder. But -- assuming it refers to Anhang's killing at all -- it is equally consistent with Marcia and Jose entering "the boat" after the murder had been committed by helping Aurea avoid prosecution.[41]

The evidence apart from Pabón's testimony was thus suggestive, but plainly inadequate to support Marcia's conviction beyond a reasonable doubt for conspiring to arrange a murder-for-hire. The government relied on Pabón's testimony -- improperly

---

[41] Indeed, multiple members of Aurea's family helped to protect her in the aftermath of the murder, including her mother, brother, and sister. Aurea's brother, Charbel, was charged with several related crimes and eventually was sentenced to twenty-four months' imprisonment on a count charging him with obstruction of justice.

bolstered by the court's judicial notice -- to fill in the gaps in its circumstantial narrative of Marcia's guilt.  Without his story of her collaboration, the evidence shows only that Marcia knew Pabón before the murder and that she took actions after the murder that supported her sister but do not on their own reflect complicity in a conspiracy.  With the limited evidence that remains if Pabón's testimony is discounted, I can only conclude that the district court's improper judicial notice caused "serious prejudice" to Marcia's defense.  Raymundí-Hernández, 984 F.3d at 152.

## C. Jose Ferrer Sosa

As with Marcia, the majority dispatches Ferrer's sufficiency claim by citing Pabón's testimony and observing that Pabón's credibility was a jury judgment.  But the paucity of the untainted evidence against Ferrer is notable.

The government established the inconsequential fact that Ferrer, a cook at the Pink Skirt, knew Pabón and had bought marijuana from him.  After the murder, multiple government witnesses testified that they saw Ferrer approach Aurea's Porsche Cayenne in the parking lot of Anhang's apartment on the day after his death.  Ferrer's presence at Anhang's home that day, and his attempt to retrieve the vehicle that testifying witnesses

consistently said belonged to Aurea, hardly constitutes evidence that he was involved in planning the murder.[42]

Other witnesses provided somewhat more probative evidence against Ferrer, but none of it is sufficient to establish his guilt for the charged conspiracy beyond a reasonable doubt. As described above, Perez-Muñoz testified that he tried to deliver one of Pabón's letters to Ferrer, but Ferrer would not accept it. According to Perez-Muñoz, Pabón had instructed him to deliver the letter "to any one of them, because Alex told me that all of them knew what happened." Even if the jury took this statement as true, "knowing" what had happened to Anhang differs from being a participant in a conspiracy. Similarly, Marcia's email to Aurea reporting that Charbel had accused Marcia and Jose of "plann[ing] everything" is no more revealing of Ferrer Sosa's involvement than it is of Marcia's.

The government also used a facially benign email exchange between Ferrer and Marcia as evidence of his culpability.

_____

[42] A Puerto Rico Police Department officer who detained Ferrer when he was "attempting to get the Porsche Cayenne" testified that Ferrer said that Marcia had asked him to get the vehicle. Aurea testified that Anhang gave her the deposit for the Porsche as a birthday gift and that she was making the monthly lease payments. Consistent with that testimony, the purchase-and-sale agreement described at trial listed Aurea as the buyer of the Porsche. Aurea and Anhang drove to the restaurant the night of the murder in Anhang's BMW, leaving the Porsche outside Anhang's apartment building.

Ferrer asked Marcia for "donations (in cash and in dollars please) to help the young adult Jose Ferrer, who is in need of everything." He also told Marcia that she could "tell Aury that if she wants to donate the most she can, she can give it to you and you can bring it." The government suggested that these emails represent Ferrer asking for hush money -- i.e., "money for him to stay in line." That inference, however, is unsupported by anything on the face of the messages.

To be sure, in his testimony, Ferrer offered an odd explanation for the "donations" -- he said he was using that terminology to ask for repayments on a loan he had made to the Vázquez Rijos family. But neither his request for funds nor his testimony explaining it indicates in any way that he participated in a conspiracy to kill Anhang. Indeed, Ferrer's email requests for "donations" are interspersed in an exchange of messages with Marcia that include expressions of love for each other and regards from Marcia to Ferrer's dogs and family members. In one message, Marcia asks him about his pants size and suggests that he needed money for essential items: "Remind me if you are still 32 for pants. That is what you most need, right?" It is only Pabón's testimony that even arguably contextualizes Ferrer's solicitation of "donations" as requests for a payoff related to the murder.

Hence, as with Marcia, I cannot conclude that it is "reasonably probable" that the jury would have reached the same verdict on the conspiracy charge against Ferrer if the court had not added to the evidence on Pabón's credibility with its judicial notice. Indeed, the court itself implied that the entirety of the government's case against Ferrer was Pabón's testimony. During his defense case, Ferrer sought to introduce a witness who had been in the courtroom during Pabón's testimony. During a sidebar conference about whether the witness was compromised and therefore unable to testify for Ferrer, the district court remarked that "if [the witness] heard the testimony of . . . Pabón Colón, if he heard that testimony, he heard the entire evidence relating to your client. He heard it completely."

## IV. Conclusion

The jury verdicts in this case resulted in life sentences for each of the three defendants. It is therefore unsurprising that their advocates have raised numerous challenges to the way the trial and sentencings proceeded. The lack of merit in most of those claims should not deter us from acknowledging the very real harm caused to Marcia and Ferrer by the district court's improper intervention on behalf of the government on the key issue of Pabón's credibility. The court should not have provided judicial notice to the jurors that it found Pabón competent to enter his

- 112 -

guilty plea in 2008.  Marcia and Ferrer's convictions inescapably are flawed because of that error, and they are therefore entitled to a new trial.  Accordingly, I must respectfully dissent from the majority's decision to affirm their convictions.